# Arthur T. Barbieri v. Cadillac Construction Corporation

House, C. J., Cotter, Loiselle, Bogdanski and Longo, Js.

Argued November 2, 1977—decision released March 21, 1978

*Charles G. Albom,* with whom, on the brief, was *Joseph I. Lieberman,* for the appellant (plaintiff).

*Norman Hewitt,* for the appellee (defendant).

Per Curiam. The plaintiff, a licensed real estate broker, brought this action against the defendant corporation on an agreement executed by the parties in which it was agreed that the defendant would pay the plaintiff $30,000 in consideration for: the plaintiff's expenditure of time and money in investigating the possibility of acting as the defendant's broker for the "sale . . . and/or leasing" of condominiums owned by the defendant; the plaintiff's agreement not to act in any way or in any capacity as the defendant's broker; and the plaintiff's waiver and forbearance from enforcing any claim as the

exclusive agent of the defendant.[1] After trial before a state referee, the court concluded that the agreement was unenforceable owing to lack of consideration and rendered judgment for the defendant. From that judgment, the plaintiff has appealed to this court.

Contrary to the recitation in the agreement, the court found that the plaintiff did not expend any

---

[1] The pertinent text of the agreement is set forth below:

"AGREEMENT

THIS AGREEMENT, entered into this 21st day of May, 1971, by and between CADILLAC CONSTRUCTION CORPORATION, a corporation organized and existing under the laws of the State of Connecticut, having its principal place of business in the Town of West Haven, County of New Haven, State of Connecticut, hereinafter referred to as the Owner, and ARTHUR T. BARBIERI of the Town and County of New Haven, State of Connecticut, hereinafter referred to as the Agent,

WITNESSETH:

In view of mutual considerations and covenants hereinafter exchanged, it is hereby agreed as follows:

1. The Owner presently has record title to certain property located in the Town of Branford described on Exhibit A attached hereto, on which property it is proposed that 400 condominium units be constructed.

2. The Agent has from time to time discussed with the Owner the possibility of acting as the broker for the sale of the property described in said Exhibit A and/or the leasing or sale of said 400 condominium units.

3. The Agent represents that as the result of the various discussions relating to the above, he has expended both time and money in investigating the possibility of acting as such agent, and in fact has relied on the Owner's statement that he would be given an exclusive agency in regard thereto.

4. The parties hereto, in order to avoid any controversy relative to the foregoing, hereby agree as follows:

a. The Agent will not in fact act in any way or in any capacity as the agent for the Owner relative to the property described in Exhibit A.

b. The Owner will pay to the Agent in full settlement of any claim alleged by the Agent, the total sum of $30,000, payable on the basis of $75 for each of said 400 condominium units to be constructed on subject premises at such time as each said unit is conveyed by the

time or money in investigating the possibility of acting as the defendant's broker. This finding was supported by the evidence. Further, in response to a motion for a more specific statement, the plaintiff alleged that a previous oral agreement between the parties furnished the basis for his consideration

Owner to a bona fide purchaser. In the event that the owner should sell the subject premises in whole or in part as undeveloped land, then the balance then due the Agent shall be payable in full. In any event said sum of $30,000 shall be payable to the Agent notwithstanding the foregoing within a period of no more than five years from the date of this agreement.

.       .       .       .       .

6. This agreement represents the complete understanding of the parties hereto, and shall insure to the benefit of and bind the heirs, administrators, executors, representatives, successors and assigns of the respective parties hereto.

IN WITNESS WHEREOF, on this 21st day of May, 1971, said CADILLAC CONSTRUCTION CORPORATION has caused this agreement to be executed in its behalf, and its corporate seal to be affixed hereto by Robert W. Bailey, its President, hereto duly authorized.

| | |
|---|---|
| Signed, sealed and delivered in the presence of: | CADILLAC CONSTRUCTION CORPORATION |
| | BY   Robert W. Bailey |
| s/   witness | President |
| s/   witness | |

STATE OF CONNECTICUT   )

ss:  New Haven, May 21, 1971.

COUNTY OF NEW HAVEN   )

Personally appeared Robert W. Bailey, President of Cadillac Construction Corporation, signer and sealer of the foregoing agreement, and acknowledged the same to be his free act and deed as such President, and the free act and deed of said corporation, before me.

NOTARY PUBLIC

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 20th day of May, 1971.

| | |
|---|---|
| Signed, sealed and delivered in the presence of: | THE AGENT |
| s/   witness | Arthur T. Barbieri |
| s/   witness" | |

under the written agreement in question.[2] Thus, the determinative issue at trial involved the existence of the alleged oral agreement between the parties giving the plaintiff the right to act as the defendant's broker.

At the time of trial on June 15, 1976, the plaintiff had been a licensed real estate broker for close to twenty years. The defendant corporation was the owner and developer of land located in Branford known as "Woodlands Property" which it intended to develop as a condominium project. Robert W. Bailey and Herbert Small were the officers, directors and stockholders of the defendant corporation which was in the business of owning and developing real estate throughout the state. Small, a real estate broker for the defendant for almost eight years prior to becoming a director and stockholder in the defendant corporation, was apparently brought into the defendant corporation in 1969 in order to provide "in house" brokerage services for the defendant. Prior to May 21, 1971, the plaintiff had also acted as the broker for property of the defendant other than the Woodlands property.

The agreement, executed on May 21, 1971, recites that the plaintiff had periodically discussed with the defendant the possibility of acting as the broker for the proposed condominium property, and, as a result of these discussions, relied upon the defendant's representations that he would be given an exclusive agency in regard to this property. "[I]n order to avoid any controversy relative to the foregoing,"

---

[2] At the time the written agreement was executed, a real estate broker's contract of employment was not required to be in writing. General Statutes § 20-325a was amended June 7, 1971, by Public Act No. 378 to require such a writing.

the defendant agreed to pay the plaintiff the total sum of $30,000 "in full settlement of any claim alleged by the . . . [plaintiff]."

The circumstances leading up to and surrounding the execution of this agreement are not entirely clear from the record presented. It is not disputed, however, that sometime before May 21, 1971, the plaintiff engaged in a number of conversations with the attorney for the defendant, Edward Marcus, concerning the possibility of acting as a broker for the defendant regarding the Woodlands property.[3] The plaintiff did not discuss this matter directly with Bailey, Small or any other individual involved in the operations of the defendant corporation. Rather, the basic issue in the controversy concerns the nature and effect of the discussions between the plaintiff and Attorney Marcus. The trial court found there was no oral agreement between Marcus and the plaintiff that the plaintiff was to act as a broker for the defendant corporation regarding the Woodlands property.

The court concluded that the plaintiff never negotiated any agency agreement with the defendant's attorney or any agent or principal of the corporation. Despite persistent questioning at trial by the defendant's own counsel, however, Marcus refused to assert that he had never entered into such an agreement with the plaintiff. Rather, Marcus repeatedly stated that he had no authority to enter into such an arrangement. The testimony of Bailey, president of the defendant corporation, who signed and acknowledged the agreement, indicated that he had no knowledge that Marcus ever entered into

---

[3] The record does not reveal the number of conversations involved, or the dates on which those discussions took place.

such an agreement on the defendant's behalf. Nevertheless, in spite of such claimed lack of any oral agreement with the plaintiff, the defendant, through Bailey, agreed to pay the plaintiff in satisfaction of any claim relating to the alleged oral understanding with Marcus.

On the basis of the testimony of Bailey, the court found that the defendant signed this written agreement because it did not want "any trouble"; it feared negative action on the part of the plaintiff; and it feared his "long reach." In addition to the above finding, however, the court found that "[t]he plaintiff had been Democratic Town Chairman of New Haven for many years and was an important and powerful political leader in the State of Connecticut." Since this finding was found without evidence and was not a proper matter of which judicial notice may be taken; *Thomas* v. *Commerford,* 168 Conn. 64, 68, 357 A.2d 476; 29 Am. Jur. 2d, Evidence, § 122; it must be stricken. Practice Book § 628.

In its brief, the defendant argues that this finding is immaterial to the essential issue of consideration involved in this case and, therefore, if erroneous, such an error is harmless. It would be difficult, if not impossible, however, to determine if such a finding regarding the reputation of a party to a civil suit influenced the ultimate decision of the court.

" 'In a civil action the character or reputation of a party is deemed by the law to be irrelevant in determining the merits of the controversy. . . . In the eyes of the law, the inferences which might be drawn from evidence of character and reputation of the parties are too vague, uncertain and unreliable to be worthy of consideration in determining the merits, however just and reasonable such inferences

may seem to the lay mind.' 1 Jones, Evidence (4th Ed.), § 148." *Bosworth* v. *Bosworth,* 131 Conn. 389, 391, 40 A.2d 186. Unless character has been put into issue, in civil proceedings, evidence of character is not admissible. *Humphrey* v. *Humphrey,* 7 Conn. 116, 117.

We have said that the conclusions reached by a court in a case tried without a jury will be tested by this court only by a review of the subordinate facts found by the trial court as corrected on appeal. *Terrace Estates* v. *New Britain,* 166 Conn. 469, 471, 352 A.2d 303. However, the conclusion of the court below was drawn with the possibly damaging reference to the plaintiff's reputation as an established fact. Although it may be true that the decision at which the court arrived upon the merits of the case might have been unaffected by this improper finding, we cannot be certain of it. See *Buckingham's Appeal from Probate,* 60 Conn. 143, 160, 22 A. 509. "A judge has not such control over his mental faculties that he can definitely determine whether or not inadmissible evidence he has heard will affect his mind in making his decision." *Kovacs* v. *Szentes,* 130 Conn. 229, 232, 33 A.2d 124; *Peck* v. *Pierce,* 63 Conn. 310, 320, 28 A. 524.

Since we cannot speculate as to the degree of influence which the objectionable finding had in the final result, unless it clearly appeared that no harm could have been done, "the safer rule is to grant a new trial." *Buckingham's Appeal from Probate,* supra; *Jacques* v. *Bridgeport Horse R. Co.,* 41 Conn. 61, 66.

There is error, the judgment is set aside and a new trial is ordered.