BRIAN LEDDY *v.* HOWARD RACCIO
(AC 30014)

Gruendel, Lavine and Mihalakos, Js.

Argued October 28—officially released December 29, 2009

*Daniel J. Krisch,* with whom was *Brendon P. Levesque,* for the appellant (defendant).

*William F. Gallagher,* with whom, on the brief, were *Hugh D. Hughes, Louis M. Federici, Jr.,* and *Joseph Porto,* for the appellee (plaintiff).

*Opinion*

LAVINE, J. The defendant, Howard Raccio, appeals from the judgment of the trial court, rendered after a trial to the court, in favor of the plaintiff, Brian Leddy. On appeal, the defendant claims that the court improperly concluded that it could ignore deposition testimony concerning uncharged misconduct involving the defendant and another person. The defendant claims that this misconduct evidence had an incurably prejudicial effect on the court's consideration of the case. We disagree and affirm the judgment of the trial court.

The court reasonably could have found the following facts in making its decision. The plaintiff grew up on Hillfield Road in Hamden, about three quarters of a mile from the defendant's home. The plaintiff's family became friendly with the defendant's niece, Barbara Sacramozza,[1] who also lived on Hillfield Road. Through Sacramozza, the plaintiff's family and the defendant became close family friends. The plaintiff thought of the defendant as "Uncle Howard."

The plaintiff would see the defendant at family gatherings and holiday parties. When the plaintiff was between the ages of eight and twelve, he would sometimes go to the defendant's house by himself. During two of these visits, the defendant kissed the plaintiff, put his hand down the plaintiff's pants and touched the plaintiff's genitals. When the plaintiff said that he did not like that, the defendant told him that it is what friends do for each other and also that friends do not tell on each

---

[1] Throughout the trial, Sacramozza also was referred to as Barbara Daddio, her married name at the time many of the events in question took place. To avoid confusion, we will refer to her as Sacramozza.

other. The plaintiff did not tell anyone about what happened, and, after the second episode, he did not return to the defendant's house for some time.

When the plaintiff was either fourteen or fifteen, after a Christmas party at the defendant's paving company, the defendant gave the plaintiff a ride home and again kissed him and put his hands down the plaintiff's pants. The plaintiff pushed the defendant away but again did not tell anybody about the incident. Later during his teenage years, the plaintiff occasionally would do work with the defendant's company, though he was not on the payroll, or do chores around the defendant's house. He also occasionally would go to the defendant's house to drink beer and to talk. Approximately five or six times, as the plaintiff was leaving the defendant's house, the defendant would give him a hug and put his hands down the plaintiff's pants. The defendant would then give the plaintiff money, which the plaintiff understood to be in exchange for his not telling anyone about the defendant's actions.

The plaintiff went to a private boarding high school and then matriculated at the University of Vermont. He saw the defendant infrequently during those years. After graduating from college, the plaintiff held jobs in several different states before moving back to Hamden, where he married and started a family. Soon after his first child was born, in 2002, the plaintiff was angered by a flashback he had about the defendant.

A few years later, in April, 2004, the plaintiff was with his family at Sacramozza's house for an Easter brunch. He saw the defendant with a young boy on his knee, took his own child into the other room and left the party soon after so that the defendant "couldn't touch [his] kid." A short time later, the plaintiff divulged his sexual abuse at the hands of the defendant to

Sacramozza.[2] Sacramozza suggested that the plaintiff write the defendant a letter explaining how he felt. Instead, the plaintiff anonymously sent a threatening letter.

In the letter, the plaintiff wrote that "Barbara knows." The defendant called Sacramozza and asked her if she knew who authored the letter. After conferring with the plaintiff, Sacramozza told the defendant that she could not tell him. The defendant threatened to call the police and to have her arrested. He then asked Sacramozza whether the author was a relative. Sacramozza responded by asking the defendant how many children he had abused, if he did not know who wrote the letter.[3]

Thereafter, the plaintiff sued the defendant for assault and battery for the alleged sexual abuse. The defendant denied these allegations and filed a three count counterclaim alleging intentional infliction of emotional distress, negligent infliction of emotional distress and assault. A court trial was held beginning on May 22, 2007.

At trial, the defendant denied molesting the plaintiff and further testified that he was not sexually interested in children. The court admitted, over defense objection on grounds that the uncharged misconduct was dissimilar in nature to the conduct underlying the claims of this case, the deposition testimony of Jon Mangini, a relative of the defendant, both for substantive and impeachment purposes.[4] Mangini's testimony was that,

---

[2] The plaintiff later disclosed the sexual abuse to his parents. The plaintiff's mother testified that the plaintiff was choked up and on the verge of tears when he told them about his past sexual interactions with the defendant.

[3] The defendant testified that Sacramozza answered his question by telling him that the author was not a relative.

[4] The testimony of Scott Leddy, the plaintiff's brother, also was admitted to impeach the defendant's claim that he was not sexually interested in children. Scott Leddy testified that the defendant asked him, on numerous occasions, if he wanted "to be gay just once" for the defendant and offered to buy him a dirt bike if he would engage in sexual acts with the defendant.

beginning when he was fifteen years old and continuing until he was eighteen or nineteen, the defendant performed sexual acts on him as often as two or three times per week.

Although the court was uncertain whether it should admit Mangini's deposition, it ultimately allowed the testimony into evidence, though it reserved the right to rethink its position. The court noted that if it changed its mind, it would say so "explicitly" in its memorandum of decision, noting that it "commit[ed] error letting it in" and that the court would not "[consider] it in [its] opinion."

In its memorandum of decision, the court wrote: "Finally, the court will discuss the weight, if any, it gave to the deposition testimony of Jon Mangini, which it felt constrained to let in, as to his allegations of sexual assault by [the defendant], to let in under the authority of *State* v. *Kulmac*, 230 Conn. 43, 644 A.2d 887 (1994). [C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008)] has a well articulated objection to *Kulmac* at § 4.19.13, pp. 168–71. [It] notes that in *State* v. *Romero*, 269 Conn. 481, 498, 849 A.2d 760 (2004), several limitations were put upon the reach of *Kulmac*—such evidence must (1) not be too remote in time, (2) the conduct must be similar to the charged offense and (3) the sexual assault must be committed upon a person similar to the victim. The court let this evidence in but now has reservations about it. The third *Romero* criteria is met—at the time of the alleged assaults both [the plaintiff] and Mangini were young men who were athletic and played sports. But at the time of his deposition testimony in 2007, the incidents Mangini described occurred some fifteen years before, and the type of sexual assaults and activity was much more serious in nature, although the plying with alcohol, money and drugs bears a similar pattern. Suffice it to say the court has not based its conclusion that sexual molestation

occurred here based on the experts' or Mangini's testimony. It relied solely on the testimony of [the plaintiff], his parents and . . . Sacramozza." The court awarded the plaintiff $750 in economic damages and $150,000 in noneconomic damages.[5]

The defendant filed a motion for articulation requesting that the court clarify its factual and legal bases for admitting Mangini's deposition testimony and its subsequent decision to disregard the deposition testimony. The court, in its response to the motion for articulation, wrote: "When the court let the deposition testimony of . . . Mangini in, it felt constrained to do so by the holding in *State* v. *Kulmac*, supra, 230 Conn. 43. In its decision, the court noted Tait's 'well articulated objection to *Kulmac* at § 4.19.13, pp. 168–71.' The court cited *State* v. *Romero*, supra, 269 Conn. 481, noted by Tait, and mentioned the limitations *Romero* put on the broad sweep of *Kulmac*. The court then said that because of *Romero* and the problems it has with *Kulmac*: 'The court let this evidence in but now has reservations about it.' It noted in its decision the problems it had upon reconsideration—remoteness in time and whether conduct was similar. For those reasons, the court said it would not and in fact did not base its conclusion that molestation occurred here based on Mangini's deposition testimony but relied for its conclusion on [the plaintiff], his parents and the family friend . . . Sacramozza. The court gave no weight to Mangini's deposition testimony, or that of [James Ciarci, a psychiatrist who had examined the plaintiff], in reaching its decision that [the defendant] had molested [the plaintiff] and clearly so stated . . . ."[6] The defendant filed

---

[5] The court also awarded the defendant $8583.90 in economic damages and $7500 in noneconomic damages on his intentional infliction of emotional distress counterclaim. The court dismissed the defendant's assault and negligent infliction of emotional distress counterclaims. These rulings are not at issue on appeal.

[6] We do not agree with the defendant's assertion that the court, in either its memorandum of decision or articulation, concluded that it had wrongly

a motion for review, which was granted by this court but for which relief was denied, and this appeal followed.

The defendant claims that the court improperly concluded that, in reaching its conclusion, it reasonably could ignore the Mangini deposition testimony because of the incurably prejudicial effect the testimony had on the court's consideration of the case. Specifically, he argues that once the court admitted the deposition testimony into evidence, the court was unable, despite its assertion that it did not consider Mangini's testimony in coming to its conclusion, to ignore the evidence and to render an unprejudiced decision.

We note at the outset that the defendant's evidentiary claims are reviewed under our well established standard. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *Viera* v. *Cohen*, 283 Conn. 412, 452,

admitted the Mangini deposition testimony. The court previously had stated that if it were to come to the conclusion that the deposition testimony had been wrongly admitted, it would say so explicitly in its decision. Although the court expressed its "reservations" and stated that it would not consider the Mangini deposition testimony, it did not explicitly say that the evidence was wrongly admitted. Even its discussion of *Kulmac* and *Romero* does not resolve the issue, as no one factor is dispositive of whether the evidence is admissible, and it is unclear what weight the court assigned each factor. See *State* v. *Romero*, supra, 269 Conn. 498. Our resolution of this case, however, is not affected by whether the court excluded the evidence or merely did not consider it when rendering its decision.

927 A.2d 843 (2007). "Additionally, it is well settled that even if the evidence was improperly admitted, the [defendant] must also establish that the ruling was harmful and likely to affect the result of the trial." (Internal quotation marks omitted.) *National City Mortgage Co.* v. *Stoecker*, 92 Conn. App. 787, 797, 888 A.2d 95, cert. denied, 277 Conn. 925, 895 A.2d 799 (2006).

The defendant, however, does not claim that the court erred in admitting this evidence at trial on evidentiary grounds. Rather, according to the defendant, the court abused its discretion by rendering a decision under the belief that it was able to ignore this evidence. The defendant primarily relies on *Peck* v. *Pierce*, 63 Conn. 310, 28 A. 524 (1893), and *Kufferman* v. *Fairfield University*, 5 Conn. App. 118, 497 A.2d 77 (1985), which, he claims, together stand for the general proposition that in a court trial, the court's posttrial exclusion of inadmissible evidence after its initial admission at trial requires a new trial. *Peck* and its progeny refuse to accept assertions by trial judges that they are able to ignore certain wrongly admitted evidence in making their decisions, believing that "the operations of the human mind are so subtle, and the influences which affect it so difficult to be appreciated, that it is utterly improbable, not to say impossible, for the party making them to know whether the evidence influenced him or not; holding that all that such statements can mean is that the maker of them was unconscious of the influence." (Internal quotation marks omitted.) *Peck* v. *Pierce*, supra, 320. "A judge has not such control over his mental faculties that he can definitively determine whether or not inadmissible evidence he has heard will affect his mind in making his decision." (Internal quotation marks omitted.) *Barbieri* v. *Cadillac Construction Corp.*, 174 Conn. 445, 451, 389 A.2d 1263 (1978); *Kovacs* v. *Szentes*, 130 Conn. 229, 232, 33 A.2d 124 (1943).

The inquiry does not end whenever a court, following trial, excludes a piece of inadmissible evidence that had been admitted initially. *Peck* notes that "the question in each case of this kind must be determined by a consideration of the facts in the particular case . . . ." *Peck* v. *Pierce*, supra, 63 Conn. 320. Although this court, in *Kufferman*, previously has reached a similar conclusion as the *Peck* court and ordered a new trial, we also fully agree that "*Kufferman* . . . must be held to its facts." *Manaker* v. *Manaker*, 11 Conn. App. 653, 656, 528 A.2d 1170 (1987).

The facts that existed in *Kufferman* are not the facts of this case. In that action to recover for damage to a leased premises, the court admitted, over the defendant's objection, "a letter written by the defendant stating that it was willing to concede $3600 for painting although its position was that it was not responsible for this item of repair." *Kufferman* v. *Fairfield University*, supra, 5 Conn. App. 119–20. In its memorandum of decision, the court wrote that it now agreed with the defendant's objection "that [the letter was] part of the settlement negotiation and . . . therefore may not be considered by the court." (Internal quotation marks omitted.) Id., 120. This court noted that given that set of facts, it was "difficult to say . . . whether the evidentiary defect might have been cured . . . or whether the plaintiffs would have introduced other evidence if they had known that this evidence was to be excluded." (Citations omitted.) Id., 120–21. In the present case, however, the court's refusing to consider the Mangini deposition, which was introduced by the plaintiff, when making its decision was favorable to the defendant, and the plaintiff does not complain. See *Manaker* v. *Manaker*, supra, 11 Conn. App. 656. Unlike *Kufferman*, we are not concerned about whether the plaintiff's case was prejudiced by the exclusion of the Mangini deposition testimony because it is the defendant, not the plaintiff, who complains.

"Surely, a trial judge is able to disregard evidence erroneously admitted or only consider that evidence for the limited purposes for which it is admissible." Id., 656. "The mere fact that information has improperly come to the attention of the trier does not invariably compel a new trial. We have repeatedly acknowledged, in cases tried to a jury, that curative instructions can overcome the erroneous effect of statements that a jury should not have heard. . . . It would be anomalous indeed to hold that an experienced trial court judge cannot similarly disregard evidence that has not properly been admitted." (Citations omitted.) *Ghiroli* v. *Ghiroli*, 184 Conn. 406, 408–409, 439 A.2d 1024 (1981).

The defendant posits that even if a judge is able to disregard certain evidence in some cases, Mangini's testimony was so inflammatory that it could not be ignored despite conscious efforts to do so. He argues that the inflammatory nature does not necessarily stem from the subject matter of the testimony[7] but, rather, from the vast differences between the content of Mangini's testimony and the plaintiff's testimony. See *State* v. *Ellis*, 270 Conn. 337, 365–68, 852 A.2d 676 (2004) (uncharged misconduct presented to show common scheme, but not sufficiently similar to underlying charged conduct, may be considered error on review).

This case is unlike *Ellis*. There, the defendant, Robert Ellis, had sexually abused three girls. Id., 343. He was the softball coach of two of the victims, had a close, personal relationship with them and sexually assaulted them in similar ways under similar conditions. Id., 359–61. His interactions with the third victim were wholly different. She was not a member of one of his softball teams and did not have a personal relationship with

[7] In evaluating this claim, we assume, but do not decide, that the Mangini deposition testimony was not so inflammatory that its probative value was outweighed by the danger of unfair prejudice that resulted from its admission. See Conn. Code Evid. § 4-3.

Ellis. Id., 346. Rather, she was the sister of a team member and daughter of a business partner of Ellis. Id. The sexual abuse of the third victim occurred on many more occasions and tended to be more severe than with either of the other girls. Id., 359–60.

In comparing the facts of this case to *Ellis*, the defendant seizes on the differences in frequency and scope of the sexual assaults. As in *Ellis*, Mangini's deposition details a far more extreme and extensive history of sexual abuse than that described by the plaintiff. The defendant, however, fails to note the similarities. Both Mangini and the plaintiff were either related to the defendant or had such a close relationship with him that they considered him a relative, did work around the defendant's house and were athletic, teenaged males. He lured both boys with money and alcohol.[8] The difference in the number of times the sexual abuse took place and the severity of the abuse stems solely from the fact that Mangini, interested in the money, alcohol and access to the defendant's cars, accepted the defendant's advances while the plaintiff rebuffed the defendant. This case is unlike *Ellis*, and the instances of the defendant's conduct with Mangini and his conduct with the plaintiff are not so dissimilar so as to be of the inflammatory nature that the defendant would like us to believe.

In this case, the court's declining to consider the Mangini deposition did not prejudice the defendant, and we have no basis for discountenancing the court's statement of the evidence it took into consideration in rendering its decision. Furthermore, it was not reversible error to limit the use of the evidence for an admissible purpose,[9] or to not consider it at all. "There may,

---

[8] The court recognized these similarities in its memorandum of decision, noting "the plying with alcohol, money and drugs bears a similar pattern."

[9] We note that the court admitted the Mangini deposition both for substantive and impeachment purposes, though its memorandum of decision states that the court used it for neither purpose. Evidence that is inadmissible for

however, be instances where it is so unclear what effect the disputed evidence might have had, or where its prejudicial effect is so overwhelming, that the fair administration of justice requires a new trial." (Internal quotation marks omitted.) *Manaker* v. *Manaker*, supra, 11 Conn. App. 657. This is not such a case.

Even if we assume arguendo that the court abused its discretion by rendering a decision under the belief that it was able to put aside this evidence, the defendant is unable to prove that the error was likely to affect the outcome of the case. The memorandum of decision makes clear that the court struggled with an admittedly difficult decision. It noted, however, that the plaintiff had no motive in acting so emotionally when telling his parents and Sacramozza of the abuse prior to trial if the abuse had not actually occurred. The court stated: "During the trial, the court watched the demeanor of both of the parties very carefully, and it was obvious at least to it that [the plaintiff] could hardly contain his emotions, at least as far as the incidents themselves. His testimony had the ring of truth. To the court, the defendant's denials almost had a mechanical air to them." The court's decision to credit the plaintiff's testimony more than the defendant's is solely the province of the trier of fact, and we will not interfere with that credibility assessment on appeal. See *State* v. *Lawrence*, 282 Conn. 141, 155–56, 920 A.2d 236 (2007).

"Since we cannot speculate as to the degree of influence which the objectionable finding had in the final result, unless it clearly appeared that no harm could have been done, the safer rule is to grant a new trial." (Internal quotation marks omitted.) *Barbieri* v. *Cadillac Construction Corp.*, supra, 174 Conn. 451. We conclude from an examination of the evidence, excluding

one purpose may be admissible for another. Conn. Code Evid. § 1-4; *Blanchard* v. *Bridgeport*, 190 Conn. 798, 805, 463 A.2d 553 (1983).

the Mangini deposition, that there was sufficient evidence from which the court could have found, by a preponderance of the evidence, the material and controlling facts set forth in the memorandum of decision. These facts, so found, are consistent with and fully sustain the judgment rendered.

The judgment is affirmed.

In this opinion the other judges concurred.