STATE OF CONNECTICUT *v.* CONSTANTINOS
ANTONARAS
(AC 33831)

Gruendel, Lavine and Alvord, Js.

Argued June 1—officially released August 28, 2012

*Daniel J. Foster*, special public defender, for the appellant (defendant).

*Margaret Gaffney Radionovas*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Chris A. Pelosi*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Constantinos Antonaras, appeals from the judgment of conviction, rendered following a jury trial, of five counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), nine counts of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1) and fourteen counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that the trial court improperly (1) admitted evidence of the defendant's uncharged sexual misconduct with two other minors, (2) instructed the jury that it could consider the uncharged misconduct as evidence of a common scheme or plan and (3) failed to inquire as to a potential conflict of interest involving defense counsel and the Hartford police department. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 1995, the victim, D,[1] who was nine years old, lived with his father and his father's girlfriend in East Hartford. D met the defendant when D and a friend were shoveling snow near a restaurant owned by the

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

defendant. D approached the defendant and asked if he could shovel at the restaurant. The defendant agreed and paid D approximately $50. Thereafter, D occasionally helped the defendant at the restaurant and delivered flyers for him.

On June 18, 1996, D was sent to the Children's Home of Cromwell (children's home), a residential treatment facility, for behavioral issues.[2] In March, 1998, when D was eleven years old, he was discharged from the children's home and resumed living with his father in East Hartford. D's relationship with his father and his father's girlfriend soured,[3] however, and in June, 1998, D moved in with his aunt, uncle and four cousins in Hartford.

At about this time, when D was eleven years old, he ran into the defendant again. D was playing basketball at a park across the street from the defendant's residence on Orange Street in Hartford. The defendant was cleaning his car and D approached the defendant. The defendant then took D to batting cages and for ice cream. Afterward, the defendant gave D his cell phone number, which D would call from time to time. During the next two months, the defendant took D shopping, bought him clothes and sneakers, gave him money and took him roller skating. Although the defendant took D's cousins to the roller skating rink as well, he did not pay for their admission; he only paid for D.

In August, 1998, the defendant asked D to come to his house on Orange Street to help him change a tire.

---

[2] D testified that he was sent to the children's home because he "had a couple [of incidents] with the law" for "throwing rocks at cars" and "pushing a kid off of a bike and taking his money." When asked if there was "any other reason why [he] ended up" at the children's home, D responded: "Just being disobedient of my dad."

[3] D testified that his father started beating him again and that on one occasion his father's girlfriend struck him and D pushed her back. D's father then kicked him out of the house.

D arrived with two of his cousins, but the defendant told the cousins to wait outside. The defendant told D to sit down in the living room and turned on the television for him. As D was watching television, the defendant sat down next to D and began rubbing D's leg and telling him that he liked him. The defendant also began "rubbing on [D's] private area." The defendant then performed oral sex on D, placed D's hand on the defendant's penis and masturbated in front of him. Afterward, the defendant told D not to tell anyone and D began to cry. D left the defendant's house, discovered that his two cousins no longer were outside and ran home. Later that night, the defendant took D and his two cousins roller skating.

Approximately one week later, the defendant again took D and his two cousins roller skating. The defendant dropped the cousins off afterward and took D to get ice cream in West Hartford. The defendant then drove to a parking lot, pulled down his pants and began rubbing and kissing D. The defendant performed oral sex on D, and D performed oral sex on the defendant. Approximately one week after the first parking lot incident, the defendant took D back to the parking lot in West Hartford and had anal sex with him. The defendant then performed oral sex on D.

On Christmas day, 1998, the defendant took D back to the parking lot and gave him a CD player, sneakers and money as gifts. The defendant and D then performed oral sex on each other. That same day, the defendant took D, his two cousins and one of D's friends to a restaurant at the Mohegan Sun casino. The defendant paid for everyone's meal. Between August, 1998, and May, 1999, the defendant took D to the West Hartford parking lot for sex approximately ten times. On one occasion, while D's two cousins were roller skating, the defendant took D to a parking lot in Vernon, where the defendant had oral and anal sex with him.

On May 4, 1999, D was sent to the children's home a second time.[4] The defendant visited D there every time D was permitted visitors or had weekend passes. On four or five occasions when D had weekend passes, the defendant took D to Homewood Suites in Windsor Locks, where the two had sex. On one of these occasions, the defendant played a pornographic video for D "to get [D] off." Also during D's second stay at the children's home, the defendant took D to the defendant's sister's apartment in Hartford, where the defendant performed oral sex on D.

D left the children's home on August 1, 2000, when he was fourteen years old, and moved in with the defendant, D's uncle and D's cousin. The defendant continued providing D with gifts and money. D and the defendant slept in the same room in separate beds and had oral sex with each other "[a] lot." Whenever D would attempt to refuse the defendant's advances, the defendant would "work his way into it" by offering D favors. In October, 2000, the defendant rented an apartment on Barnard Street in Hartford, where only D and the defendant resided. At Barnard Street, the defendant and D had sex "about three or four times a week." The defendant also played pornographic movies for D at the residence. On April 12, 2001, the defendant became D's temporary legal custodian.

On January 15, 2002, D was sent to the Long Lane School, a juvenile detention facility, for stealing a car and for truancy. On February 14, 2002, the defendant was appointed D's legal guardian, after D and the defendant convinced D's father to consent. On August 16, 2002, when D was sixteen years old, he left the Long Lane School and moved in with the defendant in Wethersfield. At the Wethersfield residence, the defendant

---

[4] D was sent to the children's home in connection with his arrest for shooting his BB gun through a residential window.

and D continued having sex. Eventually, the sex occurred less often because D "didn't want to do it anymore." The defendant reacted by refusing to buy D "stuff anymore, giving [him] money less, [and giving fewer] rides . . . ." In January, 2004, D finally ended the sexual relationship by physically restraining the defendant during one of his advances. Thereafter, D and the defendant argued often, and D moved in with his aunt for one and one-half months before returning to the defendant's residence.

In May, 2004, D reported the defendant's sexual abuse to the department of children and families (department).[5] Thereafter, D was interviewed by the Hartford, West Hartford, Wethersfield, Vernon and Windsor Locks police. The defendant was charged by information with five counts of sexual assault in the first degree, nine counts of sexual assault in the second degree and fourteen counts of risk of injury to a child. On May 9, 2007, the jury found the defendant guilty on all charges. On February 15, 2008, the court sentenced the defendant to a total effective term of forty-six years of imprisonment, suspended after thirty-six years, and twenty years probation. Additional facts will be set forth as necessary.

I

The defendant first claims that the court abused its discretion in admitting the testimony of two witnesses who alleged that he sexually abused them when they were younger. We disagree.

The following additional facts and procedural history are relevant to this claim. The state filed written proffers of the expected testimony of C and R regarding

---

[5] The department personnel eventually convinced D to accept placement at a youth shelter in Hartford.

uncharged sexual misconduct perpetrated by the defendant.[6] The state contended that the uncharged misconduct evidence was admissible under the common scheme or plan exception to the rule against hearsay. The defendant filed a written objection and memorandum of law in opposition to the state's proffers, and the court held a hearing outside the presence of the jury on whether to admit the testimony.

At the hearing, C testified that he met the defendant when he was nine or ten years old at the park across the street from the defendant's residence, on Orange Street in Hartford. C lived near the park and played sports there. C and the defendant became friends, and the defendant drove C and C's brother to soccer games. C eventually worked for the defendant and the defendant's brother at their respective restaurants. The defendant took C to "the casino" once, played basketball with him, bought him a chain necklace from Greece and allowed him to eat for free at the restaurants. The defendant and C also talked on the telephone.

When C was between twelve and fifteen years old, he was riding in the defendant's vehicle after having worked at his restaurant. The two were traveling to the defendant's apartment, where C was staying for the night. As the defendant was driving, "[h]e slowly ran his hand down the side of [C's] leg until [C became] aroused," and then he began rubbing C's penis with his hand underneath C's shorts and underwear. This continued for approximately ten minutes until they arrived at the defendant's apartment. C was "in shock," and as soon as he entered the apartment he "grabbed a sheet" and wrapped it around himself. C stated that the defendant then started rubbing C's leg and butt. C

---

[6] The state also sought to present the testimony of two other victims of the defendant's sexual misconduct, which was uncharged. The trial court, however, excluded their testimony.

told the defendant to stop, and the defendant eventually relented. C stopped seeing the defendant after this incident.[7]

R testified at the hearing as follows. R met the defendant when he was eleven or twelve years old at his aunt's house. R left his aunt's house with the defendant to go to Foxwoods Casino (Foxwoods).[8] As the defendant was driving, he placed his hand on R's knee and squeezed it. R felt uncomfortable and pushed the defendant's hand off his knee. At Foxwoods, the two played video games, watched a movie and ate at a restaurant. The defendant paid for everything. Thereafter, the defendant played sports with R, bought him sports equipment and took him to eat at the Subway restaurant where the defendant worked.

A few weeks after the Foxwoods trip, the defendant picked up R from his house and took him to the defendant's residence. R was watching a basketball game on the defendant's couch when the defendant sat next to him. The defendant placed his hand around R's neck, lifted up his shirt and began rubbing his stomach. The defendant then asked to see R's "trail," which referred to R's "pubic hairline going down" to R's genitals. R attempted to stand up, but the defendant forced him to sit back down and continued his attempt to see R's "trail." R then stood up, unlocked the defendant's door and asked the defendant to take him home.

On another occasion, the defendant bought R a wrestling suit, and after R tried it on the defendant told R to weigh himself. R weighed himself wearing only his

---

[7] C also testified that on a prior occasion, he was playing soccer and was hit by the ball in his "private area . . . ." The defendant, who was one of the coaches at the time, came over, pulled C's shirt up and shorts down and looked at his penis. C swatted the defendant's hand away.

[8] R testified that the defendant knew R's family but that this was the first time he remembers meeting the defendant. R also testified that he did not tell his mother that he was going with the defendant to Foxwoods.

boxer shorts, but the defendant asked R "to take off [his] boxers because that's how the wrestlers do it." R did not take his boxer shorts off because he felt uncomfortable. On another occasion, the defendant played a pornographic video for R and stated: "I'm gonna show you how to live life." The defendant also showed R a Playboy magazine. R felt uncomfortable and told the defendant to take him home, which the defendant did. After this incident, R stopped seeing the defendant.

On May 1, 2007, after hearing argument from both the state and the defendant, the court admitted the uncharged misconduct testimony of C and R as common scheme or plan evidence. As to R, the court concluded that "the issue of remoteness does not really present itself . . . because the time period is so close to the time period [of the abuse perpetrated on D]. So, there is no issue of remoteness there. Similarity of the conduct is almost a template placed upon its—over its exact replica. Not only the appearances of the complainants [are] the same, the ages [were] the same, the ethnicity was the same. The defendant knew both families. Each had a trip to the casino, gifts of sports equipment, the same initial type of overtures, sexual overtures, lived in the same neighborhood, [the] defendant had been involved with [R's] family since [he] was a baby."

The court then noted the differences between D and R: "[R] was not employed at a restaurant, [and] it was a different vehicle involved . . . . And, of course, there was no guardianship. The other big difference is that [R] rebuffed the defendant's advances. And shortly thereafter there were no more advances. . . . The difference with [D] is that they were not rebuffed and they didn't stop. While this is not a signature issue, quite frankly, the conduct between . . . the defendant and [R] would raise it to that level. And I find that other

crimes evidence for common scheme purposes is more probative than prejudicial as far as [R] is concerned."

The court then concluded: "Now, in the case of [C] . . . we have the issue of remoteness. However, remoteness itself is not an answer. We do have exquisite similarity in the general identity of that victim in age, ethnicity, gender, appearance, at least what his current appearance would lead you to believe. We have the same age of initial contact, nine or ten, same place, Orange Street park, the same type of mentoring relationship. Here, the defendant becoming his soccer coach, playing basketball together, [C] helping out at the restaurant, getting paid and fed, a trip to the casino, at least one gift, similar initial sexual overtures as far as the type of touching, the defendant knowing the victim's family.

"And, of course, now we know some of the differences: no trips to the motel, no actual guardianship, and, of course, the touchings stopped. But that's after there was resistance on the part of [C]. Now, I realize that [C] came from a more intact family than [D]. But it was still a family that allowed their nine or ten year old son to be taken to the casino by the defendant without repercussions. . . . There's the same type of touching during their car ride, same type of sports and mentoring. So, on balance, the template involving the conduct testified to by [C], perpetrated by the defendant, sufficiently similar, exquisitely similar, that in this court's opinion [it] overcomes any issue of remoteness and [is] more probative than prejudicial." C and R subsequently testified in front of the jury consistent with the state's offer of proof.

"The admission of evidence of . . . uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . .

[T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . [T]he burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant . . . [who] must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Heck*, 128 Conn. App. 633, 638, 18 A.3d 673, cert. denied, 301 Conn. 935, 23 A.3d 728 (2011).

We begin our review of the defendant's claim by detailing the requirements for admitting evidence of uncharged sexual misconduct. At the time of the defendant's trial, evidence of uncharged sexual misconduct was admissible under the liberal common scheme or plan standard, which focused on "the similarity shared by the charged and uncharged crimes, rather than the existence of a genuine plan in the defendant's mind . . . ." *State* v. *DeJesus*, 288 Conn. 418, 467, 953 A.2d 45 (2008). Subsequent to the defendant's trial, our Supreme Court, in *DeJesus*, created an exception, for sex crimes, to the general prohibition against the admission of uncharged misconduct evidence for propensity purposes. Our Supreme Court explained, however, that the same standard that governed the liberal common scheme or plan exception applies to the new propensity exception.[9]

As explained in *DeJesus*, "[f]irst, evidence of uncharged sexual misconduct is admissible only if it is relevant to prove that the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged. Relevancy is established by satisfying

[9] Therefore, we may look to "prior precedent construing the scope and contours of the liberal standard pursuant to which evidence of uncharged misconduct previously was admitted under the common scheme or plan exception." *State* v. *DeJesus*, supra, 288 Conn. 477; see also *State* v. *Gupta*, 297 Conn. 211, 225 n.7, 998 A.2d 1085 (2010).

the liberal standard pursuant to which evidence previously was admitted under the common scheme or plan exception. Accordingly, evidence of uncharged misconduct is relevant to prove that the defendant had a propensity or a tendency to engage in the crime charged only if it is: (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed upon persons similar to the prosecuting witness." (Internal quotation marks omitted.) Id., 473. "Second, evidence of uncharged misconduct is admissible only if its probative value outweighs the prejudicial effect that invariably flows from its admission. . . . In balancing the probative value of such evidence against its prejudicial effect, however, trial courts must be mindful of the purpose for which the evidence is to be admitted, namely, to permit the jury to consider a defendant's prior bad acts in the area of sexual abuse or child molestation for the purpose of showing propensity." (Citations omitted; internal quotation marks omitted.) Id., 473–74.

On appeal, the defendant argues that the court improperly admitted the uncharged misconduct testimony of C and R.[10] As to C, the defendant argues that the incidents were too remote, C and D were not similar victims, and the incidents involving C were not similar to the charged offenses. As to R, the defendant argues that R and D were not similar victims and the incidents involving R were not similar to the charged offenses. The defendant further argues that the probative value of

[10] Although the uncharged misconduct evidence was admitted under the common scheme or plan exception, the defendant argues on appeal that the evidence was inadmissible under the propensity exception delineated in *DeJesus.* As the defendant concedes, if the evidence was admissible for propensity purposes, any error in admitting the testimony under the common scheme or plan exception was harmless. See *State* v. *Johnson,* 289 Conn. 437, 456–57, 958 A.2d 713 (2008), overruled in part on other grounds by *State* v. *Payne,* 303 Conn. 538, 548, 34 A.3d 370 (2012); *State* v. *DeJesus,* supra, 288 Conn. 476.

both sets of testimony did not outweigh their prejudicial effects. The state argues that the uncharged misconduct evidence was admissible pursuant to the factors delineated in *State* v. *DeJesus*, supra, 288 Conn. 418. We agree with the state.

As to the first of the three relevancy prongs, we compare the time "with reference to the period between the cessation of the prior misconduct and the beginning of the charged sexual abuse." *State* v. *Romero*, 269 Conn. 481, 499 n.20, 849 A.2d 760 (2004). C testified that the sexual misconduct occurred when he was between twelve and fifteen years old, which would have been between 1986 and 1989. D testified that he first was abused by the defendant in August, 1998. Accordingly, the interval between cessation of the prior misconduct and the beginning of the charged abuse of D was between approximately nine and twelve years. Although there are no Connecticut appellate court cases in which a twelve year gap was determined not to be too remote, there are cases indicating that a nine year or ten year gap is not too remote. See, e.g., *State* v. *Jacobson*, 283 Conn. 618, 632–33, 930 A.2d 628 (2007) (ten year gap not "insignificant" but not too remote); *State* v. *Romero*, supra, 498–500 (nine year gap not too remote).

In *Romero*, our Supreme Court also cited approvingly cases from other jurisdictions in which courts "have concluded that evidence of prior misconduct was admissible in instances in which the prior misconduct was far more remote in time than [nine years]. See *United States* v. *Meacham*, 115 F.3d 1488, 1494–95 (10th Cir. 1997) (prior sexual misconduct took place thirty years earlier); *State* v. *McGuire*, 135 Idaho 535, 539–40, 20 P.3d 719 (App. 2001) (twenty-three years); *Smith* v. *State*, 745 So. 2d 284, 289 (Ala. Crim. App. 1998) (time gaps of between eighteen to twenty years and fourteen to twenty years); *State* v. *Christopherson*, 482 N.W.2d

298, 302 (S.D. 1992) (seventeen years)." *State* v. *Romero*, supra, 269 Conn. 499 n.21. Moreover, "[e]ven a relatively long hiatus between the charged and uncharged misconduct . . . is not, by itself, determinative . . . especially when there are distinct parallels between the prior misconduct and the charged misconduct." (Citation omitted.) *State* v. *Jacobson*, supra, 283 Conn. 633; see also *State* v. *Kulmac*, 230 Conn. 43, 62, 644 A.2d 887 (1994) ("remoteness in time of a prior incident is rarely, standing alone, determinative of the admissibility of such evidence; rather, it is one factor to be considered by the trial court in making its decision"). We conclude that the time gap between the abuse of C and D is not too remote to render the uncharged misconduct irrelevant to prove that the defendant had a propensity to engage in the charged abuse, particularly in light of the other two prongs.

Regarding similarity of the uncharged misconduct to the charged abuse, the second prong, the defendant cites *State* v. *Gupta*, 297 Conn. 211, 998 A.2d 1085 (2010), and *State* v. *Ellis*, 270 Conn. 337, 852 A.2d 676 (2004), for the proposition that the uncharged misconduct against both C and R was too dissimilar in frequency and severity to the abuse of D. The state argues that the defendant engaged in a similar pattern of behavior with regard to C, R and D in order to befriend them, gain their trust and, ultimately, sexually seduce them. The state further argues that we should look to the initial sexual advances of the defendant, because "it is reasonable to infer that the only reason the defendant's sexual behavior with [C and R] was 'less severe' than that with [D] was that [C and R] rebuffed the defendant and stopped seeing him."

In a number of cases, our Supreme Court and this court have looked to the initial sexual advances of the defendant in comparing the similarity of the uncharged misconduct to the charged abuse, especially when the

uncharged misconduct witnesses rebuffed the advances or the defendant otherwise was prevented from abusing them. In *State* v. *McKenzie-Adams*, 281 Conn. 486, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007), for example, the defendant argued that his uncharged sexual misconduct with R.S. did not satisfy the similarity of abuse prong "because it was less severe than his sexual misconduct with N.R. and P.L.," the two victims of the charged abuse. Id., 530. The court explained that "the defendant's sexual misconduct with R.S. was similar to the initial stages of his sexual misconduct with both N.R. and P.L. . . . Although the defendant's sexual misconduct with R.S. did not progress beyond this initial stage, the jury reasonably could have inferred from R.S.'s testimony that his misconduct ceased only after she rebuffed his sexual advances and reported his behavior to her mother and brother. Accordingly, contrary to the defendant's claim, the fact that R.S. suffered less severe sexual misconduct than N.R. and P.L. does not illustrate a behavioral distinction of any significance." (Internal quotation marks omitted.) Id., 531; see also *State* v. *James G.*, 268 Conn. 382, 394, 844 A.2d 810 (2004) (fact that misconduct witness and victim "suffered sexual abuse for different lengths of time does not illustrate a behavioral distinction of any significance" because witness reported abuse, "thereby preventing an opportunity for continued sexual abuse"); *Leddy* v. *Raccio*, 118 Conn. App. 604, 615, 984 A.2d 1140 (2009) ("difference in the number of times the sexual abuse took place and the severity of the abuse stems solely from the fact that [the witness], interested in the money, alcohol and access to the defendant's cars, accepted the defendant's advances while the plaintiff rebuffed the defendant").

In fact, in *State* v. *Jacobson*, supra, 283 Conn. 618, our Supreme Court concluded that the uncharged misconduct was sufficiently similar to the charged abuse

even though the defendant never actually sexually abused the witness. The court explained that in light of the defendant's conduct toward the witness—including purchasing gifts for him and spending "considerable time with him, frequently in connection with [the witness'] athletic activities"—"the jury reasonably could have concluded that the defendant was grooming [the witness] for sexual abuse, as he had with [the victims of the charged abuse]. The defendant befriended [the witness] and, after gaining his trust and confidence, tested the limits of his tolerance for the defendant's inappropriate conduct by inviting him to his home and sleeping with him in the same bed. Although the defendant never sexually assaulted [the witness], the jury could have concluded that the defendant did not do so only because [the witness' mother] terminated the defendant's relationship with her son upon learning that the defendant had slept with him in the same bed." Id., 634–35.

In *State* v. *Ellis*, supra, 270 Conn. 337, our Supreme Court made clear that frequency and severity are factors relevant to the similarity of abuse analysis; id., 359–60; but the court also looked to the location of the abuse and whether it occurred in the vicinity of others. The court noted that the abuse of one of the victims, Sarah S., took place inside her home when no one else was present, while the abuse of the other three victims took place at a sports facility and "all except one occurred in the vicinity of other persons." Id., 359. Additionally, the court went out of its way to explain that the initial abuse of Sarah S. was not similar to the initial abuse of the other victims. Id., 363–64. Most importantly, the court noted that the defendant had a much different relationship with Sarah S. than with the other victims: "Sarah S., unlike the other girls, was not a member of [a] softball team [the defendant coached], did not have frequent and continuous contact with the defendant as

a player, did not take weekly private lessons with the defendant over a period of several years, did not develop a close personal relationship with the defendant and did not regard him as a confidant. Even more significantly, she did not feel compelled, as did the other girls, to cultivate or continue a relationship with the defendant following the abuse because of his ability to assist her in obtaining a college scholarship." Id., 361. Therefore, in *Ellis* the defendant *did* have the opportunity to continue the abuse of the other misconduct witnesses but did not do so, making frequency and severity more significant factors. In contrast, in this case and in the other cases cited previously, the defendant *did not* have the opportunity to continue the abuse of the other witnesses, rendering the frequency and severity of the abuse less significant.[11]

In this case, as intimated by the trial court, the defendant engaged in a similar grooming process with D, C and R. He provided them with gifts, food and, with D and C, work. He was involved in sports with all three, fostering early contact with D and C at the park across from the defendant's Orange Street residence, taking D to batting cages, coaching C in soccer, and purchasing R a wrestling suit. Additionally, he took all three boys to a casino at least once.

---

[11] In *State* v. *Gupta*, supra, 297 Conn. 211, our Supreme Court also relied, in part, on the relative egregiousness of the sexual misconduct perpetrated by the defendant, a physician who performed medical examinations on the victims. Id., 226–27. That case, however, is distinguishable because M, one of the victims, "had a four year employment relationship with the defendant's medical group preceding the date of the alleged assault, whereas J and D [the two other victims] had no relationship with him other than a physician-patient relationship." Id., 229. Additionally, "with respect to D and J, the defendant's misconduct was that he palpated their breasts in a manner intended to convey that such conduct was for a bona fide medical purpose," whereas his misconduct with M "reasonably could not be viewed as intending to represent that the defendant was engaged in a such a bona fide medical purpose." (Internal quotation marks omitted.) Id., 228 n.9.

The defendant also engaged in similar initial sexual overtures. He made his initial advances either in his vehicle or residence when he was alone with the victims. He began by rubbing the legs of his victims to test their receptiveness to his advances before escalating to more intimate contact. He also attempted to entice D and R with pornography to further his sexual misconduct. Although the defendant is correct that the abuse perpetrated on D was far more frequent and severe than that of C and R, the jury reasonably could have inferred that this was true only because C and R rebuffed the defendant and stopped seeing him, while D did not. See *State* v. *Jacobson,* supra, 283 Conn. 635; *State* v. *McKenzie-Adams,* supra, 281 Conn. 531. In our view, under the circumstances of this case, the fact that C and R suffered less frequent and severe sexual misconduct than did D "does not illustrate a behavioral distinction of significance." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams,* supra, 531; *State* v. *James G.,* supra, 268 Conn. 394. We therefore conclude that the evidence of uncharged misconduct was sufficiently similar to the charged abuse.[12]

As to the third prong, the similarity between the witnesses and the victim, the defendant's principal argument[13] is that C and R were too dissimilar to D in light

[12] The state also argues that we should not look to the severity of the abuse at all because "[w]hatever the nature of the particular sexual behavior an adult inflicts on a child, the behavior shows aberrant sexual interest, which is the significant common factor for purposes of proof of propensity." We are bound by the precedent of our Supreme Court, namely, *Ellis* and *Gupta,* which hold that severity is at least one factor to be consulted under the similarity of abuse prong.

[13] The defendant also challenges various factual statements made by the trial court in its ruling on whether to admit the testimony of C and R. For example, the defendant argues that, contrary to C's testimony that he was nine or ten years old when he met the defendant, C actually was at least thirteen years old and that there was no evidence that C was the same ethnicity as D or had a similar appearance when he was younger. The defendant also argues that there was no evidence that R was the same ethnicity as D, that the defendant knew D's family or that D received "gifts of sports equipment" from the defendant. We see no merit in these conten-

of the defendant's familial relationship with D. The defendant points to the fact that D lived with the defendant and relied on him for basic necessities and that the defendant eventually became D's guardian.

Although, over time, the relationship between the defendant and D developed into a familial type of relationship, when the abuse started, the defendant's relationship with D closely resembled his relationships with C and R. All three boys were similar in age when they first met the defendant. D met the defendant when he was nine years old, C met the defendant when he was nine or ten years old, and R met the defendant when he was eleven or twelve years old. The sexual misconduct first occurred when the boys were of similar ages as well: D was eleven years old, C was between twelve and fifteen years old, and R was eleven or twelve years old. As stated by the trial court, D, C and R have a similar appearance. Additionally, as mentioned, the defendant fostered his relationships with the boys in a similar fashion. Therefore, D, C and R were sufficiently similar victims, when the defendant's abuse of them began, so that the evidence of the uncharged misconduct was relevant to prove that the defendant had a propensity to engage in the aberrant or compulsive sexual abuse with which he was charged.

The defendant next argues that the probative value of the uncharged misconduct evidence did not outweigh its prejudicial effect because "evidence of uncharged misconduct that involves the alleged sexual abuse of a child is extremely prejudicial." We reject the defendant's argument. Although evidence of child sex abuse is undoubtedly harmful to the defendant, that is not the test of whether evidence is unduly prejudicial. Rather, "evidence is excluded as unduly prejudicial when it

tions, as there was sufficient evidence from which the jury could have found these facts.

tends to have some adverse effect upon a defendant *beyond tending to prove the fact or issue that justified its admission into evidence.*" (Emphasis added; internal quotation marks omitted.) *State* v. *James G.*, supra, 268 Conn. 399.[14] As explained in *DeJesus*, "because of the unusually aberrant and pathological nature of the crime of child molestation, prior acts of similar misconduct, as opposed to other types of misconduct, are deemed to be highly probative because they tend to establish a necessary motive or explanation for an otherwise inexplicably horrible crime . . . and assist the jury in assessing the probability that a defendant has been falsely accused of such shocking behavior." (Citations omitted.) *State* v. *DeJesus*, supra, 288 Conn. 469. Moreover, as discussed in part II of this opinion, the court provided instructions to the jury limiting its use of the evidence. We therefore conclude that the probative value of the uncharged misconduct evidence outweighed its prejudicial effect.

## II

The defendant's second claim is that the trial court improperly instructed the jury that it could consider the uncharged misconduct as evidence of a common scheme or plan. We agree that the court's charge was improper but conclude that the court's error was harmless.

After C testified in front of the jury and just before R testified, the court provided the following instruction to the jury: "Now, ladies and gentlemen, I have another specific instruction for you that will be repeated and expanded at the time of the final instruction. Before we hear from the next witness—and having just heard

---

[14] Although the uncharged misconduct evidence was admitted under the common scheme or plan exception, in light of *DeJesus* the jury properly could have considered the evidence for propensity purposes. See *State* v. *Johnson*, supra, 289 Conn. 456–57.

from the last witness, the evidence that has been testified to and I anticipate will be testified to about the—by the next witness involve an assertion of prior acts of misconduct on the part of the defendant. That evidence is not admitted to prove bad character of the defendant or the defendant's tendency to commit criminal acts. The evidence is offered solely in an attempt to establish a common plan or scheme in the commission of criminal acts. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find that it logically, rationally, and conclusively supports the issue for which it is being offered by the state, but only as it may bear upon those issues. And that is the assertion of a common plan or scheme to sexually abuse young men. On the other hand, if you do not believe this evidence or even if you do, if you find it does not logically or rationally or conclusively support the issues of common plan or scheme for which it is being offered, you should not consider this testimony for any purpose whatsoever." The court also provided a similar instruction to the jury after the close of all the evidence.

On appeal, the defendant argues that because the court instructed the jury that it could not use the uncharged misconduct evidence for propensity purposes, but could only use it as evidence of a common plan or scheme, the instruction was improper in that it conflicted with *State* v. *DeJesus*, supra, 288 Conn. 418.[15] Furthermore, the defendant argues that the

---

[15] In *DeJesus*—which was decided subsequent to the defendant's trial—our Supreme Court abandoned the common scheme or plan exception that was applicable to sex crimes as inconsistent with *State* v. *Randolph*, 284 Conn. 328, 354–55, 933 A.2d 1158 (2007), which held that the common scheme or plan exception required a showing of a " 'true' " plan in the defendant's mind. *State* v. *DeJesus*, supra, 288 Conn. 468. In its place, however, our Supreme Court created a propensity exception for sex crimes governed by the same standard that applied to the liberal common scheme or plan exception. Id., 470–73; see part I of this opinion.

improper instruction constitutes reversible error because the jury is presumed to follow the court's instructions. See *State* v. *Rivera*, 61 Conn. App. 763, 773, 765 A.2d 1240, cert. denied, 256 Conn. 901, 772 A.2d 599 (2001). The state argues that any instructional error was harmless because "[t]he inference of propensity from the defendant's pattern of aberrant sexual behavior with children would have been at least equally, and perhaps even more, damaging than an inference of common scheme. The defendant thus would have been no better off if the jury had been instructed on propensity instead of common scheme."[16] We agree with the state.

In *DeJesus*, our Supreme Court held that "to minimize the risk of undue prejudice to the defendant, the admission of evidence of uncharged sexual misconduct under the limited propensity exception adopted herein must be accompanied by an appropriate cautionary instruction to the jury." *State* v. *DeJesus*, supra, 288 Conn. 474.

---

[16] The state also argues that the defendant's claim of instructional error should not be reviewed because it is unpreserved and, if it is reviewed, that the jury instruction was not improper because *DeJesus* applies prospectively only. We disagree. See *State* v. *Kitchens*, 299 Conn. 447, 454, 10 A.3d 942 (2011) ("[n]otwithstanding the defendant's failure to preserve [his jury instruction claim] at trial, our interpretation of the kidnapping statutes in [*State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008)] may be applied to the present case because of the general rule that judgments that are not by their terms limited to prospective application are presumed to apply retroactively . . . to cases that are pending" [internal quotation marks omitted]). Our Supreme Court in *DeJesus* did not limit its judgment to prospective application, and, in fact, our appellate courts have applied the *DeJesus* propensity exception to pending cases on a number of occasions. See, e.g., *State* v. *Johnson*, supra, 289 Conn. 455–57; *State* v. *L.W.*, 122 Conn. App. 324, 330–38, 999 A.2d 5, cert. denied, 298 Conn. 919, 4 A.3d 1230 (2010). Although in this case the defendant's initial direct appeal was dismissed as untimely, his right to appeal from the judgment of conviction and the time period within which he had to file the appeal were restored pursuant to an agreement in connection with his habeas petition. Therefore, this case was pending when *DeJesus* was decided, and the rule enunciated in *DeJesus* applies retroactively. See *State* v. *Thompson*, 118 Conn. App. 140, 154–55 and 154 n.7, 983 A.2d 20 (2009), cert. denied, 294 Conn. 932, 986 A.2d 1057 (2010).

Although the court noted that "[t]he precise content of such an instruction is beyond the scope of the present appeal"; id., 474 n.36; it stated that the trial court in that case "minimized the risk of undue prejudice to the defendant by issuing" a cautionary instruction explaining that the jury could use the uncharged misconduct evidence only for common scheme or plan and intent purposes, and not "as proof that [the defendant] committed the acts charged in this case for which he is being prosecuted." (Internal quotation marks omitted.) Id., 475 n.37. Our Supreme Court also explained that the admission of the uncharged misconduct evidence "pursuant to the common scheme or plan exception, rather than [pursuant to] the propensity exception," was harmless. Id., 475–76.

As explained in *State* v. *Johnson*, 289 Conn. 437, 457, 958 A.2d 713 (2008), overruled in part on other grounds by *State* v. *Payne*, 303 Conn. 538, 548, 34 A.3d 370 (2012): "In the present case, even if the evidence of each murder was not cross admissible to prove intent or a common plan or scheme, the only potential harm that could arise from the admission of that evidence for either of those purposes was that the jury could infer that, because the defendant previously had killed women in the course of satisfying his sexual proclivities, he had done so again. Under *DeJesus* and [*State* v. *Snelgrove*, 288 Conn. 742, 766, 954 A.2d 165 (2008)], however, that evidence is admissible for that purpose. . . . Accordingly, even if we assume that the evidence was improperly admitted for other purposes, any impropriety was harmless." (Citations omitted.) Just as the *admission* of uncharged misconduct evidence for common scheme or plan purposes is harmless, we conclude that the trial court's *instruction* that the jury could consider the uncharged misconduct as evidence of a common scheme or plan was harmless.

## III

The defendant next claims that the court improperly failed to inquire as to a conflict of interest involving defense counsel and the Hartford police department. Specifically, the defendant argues that defense counsel's statement, during individual voir dire of a prospective juror, that he sometimes represents Hartford police officers and " 'some of the union' " required the court to conduct a conflict of interest inquiry. The defendant further argues that the court's failure to inquire is reversible error because the conflict of interest caused defense counsel to inadequately cross-examine a Hartford police officer and to not call other witnesses to support the testimony of a defense witness. We decline to review this unpreserved claim.

The defendant's claim is unpreserved because neither the defendant nor defense counsel claimed at trial that defense counsel may have had a conflict of interest in light of his ongoing relationship with the Hartford police department.[17] Unpreserved claims of conflict of interest of defense counsel are reviewed pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). See *State* v. *Gaines*, 257 Conn. 695, 705–706, 778 A.2d 919 (2001). The defendant, however, has not affirmatively requested *Golding* review on appeal. Therefore, the defendant's claim is unreviewable. See *In re Jan Carlos D.*, 297 Conn. 16, 20 n.10, 997 A.2d 471 (2010) (as our Supreme Court "has recognized repeatedly, a party may seek to prevail on unpreserved [constitutional] claims . . . under [*Golding*] if the party affirmatively requests and adequately briefs his entitlement to

---

[17] Although defense counsel informed the trial court prior to jury selection that the defendant sought new counsel, this request was unrelated to any potential conflict of interest involving defense counsel and the Hartford police. Moreover, after the defendant was unable to obtain the substitute counsel he wanted due to a scheduling conflict, there was no further discussion of the defendant's dissatisfaction with his counsel until sentencing.

such review in his main brief" [citation omitted; internal quotation marks omitted]).

The judgment is affirmed.

In this opinion the other judges concurred.