******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* EDDIE N. C.*
## (AC 39878)

DiPentima, C. J., and Prescott and Mihalakos, Js.

*Syllabus*

Convicted of the crimes of risk of injury to a child and sexual assault in the first degree in connection with his alleged sexual abuse of the minor victim, who was his cousin, the defendant appealed to this court. He claimed, inter alia, that the trial court improperly admitted into evidence, under the applicable provision of the Connecticut Code of Evidence (§ 4-5 [b]), certain prior sexual misconduct testimony from his cousin, S, and certain statements that the victim had made to her mother, to the victim's treating physicians, P, W and L, and to a social worker, V, under the medical diagnosis and treatment exception to the hearsay rule. *Held*:

1. The trial court did not abuse its discretion in admitting the prior uncharged misconduct evidence concerning the defendant's alleged sexual abuse of S: the twelve year gap between the uncharged conduct and the conduct with which the defendant was charged here was not too remote in time, the charged and uncharged conduct were sufficiently similar, and S and the victim were sufficiently similar to each other, as many of the acts the defendant performed on S and the victim were identical, the abuse of S and the victim occurred in the defendant's home and in the vicinity of other family members, and S and the victim were cousins of the defendant who were nearly identical in age when he began abusing them; moreover, the prior uncharged misconduct evidence involving S was highly probative, and the prejudicial effect of S's testimony was no more severe or egregious than the conduct with which the defendant was charged here.

2. The defendant could not prevail on his claim that the trial court improperly admitted into evidence, under the medical diagnosis and treatment exception to the hearsay rule, certain of the victim's statements to her mother, and to P, W and V, the record having amply supported that court's determination that the victim's statements were made for the purpose of, and were reasonably pertinent to, obtaining medical diagnosis and treatment: it was necessary for P to ask the victim about the duration, frequency, method and extent of the abuse for P to be able to treat the victim and to determine whether to transfer her to a hospital that specialized in treating child victims of sexual abuse, the victim's statements to W about the acts committed by the defendant and about the victim's pain level, as well as W's observations regarding injuries to the victim's genitalia, were necessary to determine the appropriate scope of treatment and the extent of the victim's physical and psychological abuse, and although the defendant claimed that the purpose of V's forensic interview of the victim was investigatory, the court did not abuse its discretion in admitting the victim's statements to V under the medical diagnosis and treatment exception to the hearsay rule after finding that at least one purpose of the interview was to assist P's medical examination of the victim; moreover, any error in the admission of the victim's statement to her mother that the defendant had licked her private parts was harmless, as the victim's statement was cumulative of similar statements she made to others, the overall strength of the state's case was high, and the victim's allegations were bolstered by S's testimony that the defendant had abused S in the same way when S was the victim's age.

3. The defendant's unpreserved claims that the trial court committed plain error by admitting the opinions of P and W that the victim had been sexually assaulted and by permitting P and W to improperly vouch for the victim's credibility were unavailing: even if the admission of the challenged evidence was improper, any evidentiary impropriety under the circumstances at issue did not result in manifest injustice thereby requiring reversal of the judgment, as defense counsel brought to the jury's attention P's diagnosis of sexual assault and, on cross-examination of P and W, ameliorated significantly any harmful effect of their testi-

mony and the admission of certain medical records, and the state, during closing argument, did not rely on the opinions of P or W as to whether the victim had been sexually assaulted but, instead, emphasized the medical findings of physical injury to the victim and that those findings were consistent with the victim's allegations of sexual assault; moreover, defense counsel made clear during closing argument that the jury was not bound by any of the physicians' diagnoses of sexual assault, and even if L's testimony improperly vouched for the victim's credibility, any error did not rise to the level of manifest injustice, as the state's case against the defendant was strong, and the victim's allegations were corroborated by S's testimony and W's findings that the victim had sustained physical injuries to her genitals after the victim alleged that the defendant had sexually assaulted her earlier that day.

Argued September 7—officially released November 21, 2017

*Procedural History*

Substitute information charging the defendant with four counts of the crime of risk of injury to a child and three counts of the crime of sexual assault in the first degree, brought to the Superior Court in the judicial district of Waterbury, where the court, *Crawford, J.*, denied in part the defendant's motion to preclude certain evidence and granted the state's motion to introduce certain evidence; thereafter, the matter was tried to the jury; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Heather Clark*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Catherine Brannelly Austin*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Eddie N. C., appeals from the judgment of conviction, rendered after a jury trial, of three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2); three counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2); and one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (1). The defendant claims that the trial court improperly admitted (1) prior misconduct testimony, (2) statements made by the victim, A, to her mother, treating physicians, and a social worker under the medical diagnosis and treatment exception to the hearsay rule, and (3) opinion evidence regarding the ultimate issue of whether A had been sexually assaulted, which the defendant claims constitutes plain error. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. A was five or six years old when the defendant began sexually assaulting her. The defendant is the first cousin of A's mother, J. In 2013, J worked as a dialysis technician three or more days a week. Her shift began at 4:30 a.m. and ended at 8 p.m. Due to the lack of available day care, J approached the defendant and his wife, Ashley C., and asked whether they would be able to babysit A on the days J worked. The defendant and Ashley C. agreed, and began babysitting A around September, 2013.

The dialysis center where J worked was approximately forty-five minutes away from her home, so J would drop A off at the defendant's house at approximately 3 a.m. A would then sleep or watch television on the couch in the defendant's living room until it was time for school. A returned to the defendant's house after school and remained there until J was able to pick her up after work—usually between 8 and 10 p.m.

On April 9, 2014, the defendant and Ashley C. were babysitting A when A disclosed to Ashley C. that the defendant did "nasty stuff" to her in the kitchen. Ashley C. called J and relayed that A had told her that the defendant was "doing things" to her and that A "wanted it to stop." Ashley C. was too upset to repeat A's exact words and told J that she should leave work.

On her way to the defendant's house, J called the police and asked them to meet her because A was alone with the defendant and Ashley C. and J "didn't feel safe." J and the responding police officer, James McMahon, arrived at the defendant's home at approximately the same time. When J entered the defendant's home, A began to cry. The defendant, who was sitting in the kitchen, said to J, "[J], you know me. You know I wouldn't do this."

McMahon then spoke with the defendant and asked him whether he had ever been alone with A. The defen-

dant initially responded that he had not, but later in the conversation admitted that there were times he was alone with her in the morning when Ashley C. was in the shower. McMahon also asked the defendant whether he had had physical contact with A, to which the defendant responded that he occasionally would make "farting noises on her belly" when the two were playing around.

After a short period, J and A left the defendant's house and drove to Waterbury Hospital. In the car on the way to the hospital, J asked A to tell her the truth about what happened. A responded, "Mom, he was licking my private parts."

J and A arrived at Waterbury Hospital, and A was seen by Dr. Lauren Py in the emergency department. Dr. Py conducted a general examination of A. During the examination, A told Dr. Py that the defendant had abused her earlier that day, as well as on previous occasions. Specifically, A told Dr. Py that the defendant would sometimes take her pants down, touch her, and "lick her in her private parts." A also told Dr. Py that she had pain in her genital region. After Dr. Py's examination, she recommended to J that A be transferred to either Yale-New Haven Hospital or the children's hospital in Hartford, both of which specialize in treating cases of child sexual abuse.

A was then seen at Yale-New Haven Hospital by Dr. Susan Walsh in the pediatric emergency department. A reported to Dr. Walsh that the defendant had touched her breasts, mouth, and vagina, as well as penetrated her vaginally with his penis. A also reported that she had pain in her genital region and vaginal discharge.

In addition to conducting an interview, Dr. Walsh performed an external physical examination of A. During the evaluation, Dr. Walsh observed that A's vagina was extremely tender to the touch and that A was tearful. Dr. Walsh further observed that there was discharge on A's labia, that the flap of skin over A's clitoris was especially tender and red, and that A had sustained an abrasion on the lips of her vagina. Dr. Walsh also took swabs from A's vagina and anus using a sexual assault kit, and took an additional sample from A of what Dr. Walsh believed was bodily fluid.[1]

After the examination, Dr. Walsh referred A to the Yale Child Sexual Abuse Clinic. Monica Vidro, a licensed clinical social worker at the Yale Child Sexual Abuse Clinic, called J to set up a follow-up examination of A. On April 16, 2014, Vidro conducted a forensic interview of A, which was observed by Dr. Lisa Pavlovic of the Yale Child Sexual Abuse Clinic; Daniel Dougherty, a detective in the sex crimes unit of the Waterbury Police Department; and a representative from the Department of Children and Families.

During the forensic interview, A disclosed to Vidro that the defendant had licked her genitals, as well as

put his penis in her vagina and anus. A identified the vagina and buttocks of a prepubescent female and the penis of a male on respective anatomically correct drawings. A also told Vidro that the defendant had masturbated in front of her to the point of ejaculation, and demonstrated how the defendant had moved his hands up and down his penis. Finally, A disclosed to Vidro that the defendant had shown her pornography and described certain characteristics of the individuals featured in the film.

After attending the forensic examination of A conducted by Vidro, Dougherty contacted the defendant and asked whether he would be willing to meet. The defendant indicated that he would. The meeting took place at the Waterbury Police Department, during which the defendant voluntarily waived his rights and agreed to answer Dougherty's questions. The defendant told Dougherty that on the afternoon of April 9, 2014, Ashley C. told him that A had said that the defendant was doing "nasty things" to her. The defendant told Ashley C. that he had "fart[ed]" on A. The defendant also voluntarily submitted a cheek swab for DNA and allowed Dougherty to search his phone for pornography.[2]

At trial, the state presented testimony from A, J, McMahon, Dr. Py, Dr. Walsh, Vidro, Dougherty, A's kindergarten teacher, Sarah Feola,[3] Dr. Pavlovic, and A's maternal aunt, S. The state also introduced into evidence A's medical records from Waterbury Hospital and Yale-New Haven Hospital, as well as a portion of A's forensic interview.

At the time of trial, A was seven years old. A testified that the defendant had penetrated her anally with his penis, as well as performed oral sex on her. A supplemented her testimony by circling the parts of her body that the defendant touched with his penis on an anatomically correct drawing of a young female. A also demonstrated the acts that the defendant had subjected her to using anatomically correct dolls.

A further testified that after the defendant engaged in anal intercourse with her, he masturbated until a "light green . . . light yellow" substance came out of his penis, and that he wiped his ejaculate on a piece of toilet paper and showed it to A before throwing it away. Finally, A testified that the defendant had showed her pornographic movies and described to the jury certain characteristics of the actors. Specifically, A described the actors' gender, race, clothing, the size of the bed featured, and the acts performed.

When A was asked whether any of the defendant's body parts besides his tongue had touched her vagina, she responded that they had not. The state then entered into evidence segments of A's forensic interview, conducted by Vidro, in which A disclosed that the defendant

had penetrated her vagina with his penis.

The defendant testified in his own defense,[4] as well as presented testimony from Ashley C.,[5] neighbor Fransauch Marleen Castillo, and family friend Christy C.[6] The defendant also submitted as evidence a stipulation that stated that he had not contributed to any DNA found in a biological sample taken from A shortly after she reported the abuse on April 9, 2014.

Subsequently, the jury returned a verdict of guilty on all seven counts: three counts of sexual assault in the first degree in violation of § 53a-70 (a) (2) (count one: cunnilingus; count three: penile-vaginal penetration; count five: penile-anal penetration); three counts of risk of injury to a child in violation of § 53-21 (a) (2) (count two: mouth-genital area; count four: penis-genital area; count six: penis-buttocks area); and one count of risk of injury to a child in violation of § 53-21 (a) (1) (count seven: pornography). The court sentenced the defendant to a total effective term of twenty-five years of incarceration and twenty-five years of special parole. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims on appeal that the trial court improperly admitted into evidence prior misconduct testimony through the defendant's cousin, S, to prove the defendant's propensity to engage in sexual misconduct. Specifically, the defendant argues that the misconduct complained of by S was (1) remote in time compared to the offenses charged; (2) dissimilar to the offenses charged; and (3) not committed on someone similar to A. The defendant further argues that the evidence should have been excluded because its probative value does not outweigh its prejudicial effect. We disagree.

The following additional facts and procedural history are relevant to this claim. On June 1, 2015, the state filed a motion stating its intent to offer uncharged misconduct evidence at trial, through S, the then twenty-three year old first cousin of the defendant, to prove that the defendant had a propensity to engage in the type of sexual misconduct complained of by A. The state proffered that the defendant had sexually abused S when she was a child, beginning when she was four or five and continuing until the age of ten.[7] The state further proffered that the majority of the abuse occurred at the defendant's family home. For the first two or three years, the defendant inappropriately touched S's chest and vagina over her clothes. When S was seven, however, the abuse progressed to the defendant performing oral sex on her, anally penetrating her with his penis, and vaginally penetrating her with his fingers. The state also proffered that the defendant had shown S pornographic movies.

The state argued that the prior misconduct evidence was relevant because (1) S and A were the same age when the alleged abuse began; (2) S and A are both cousins of the defendant; (3) the instances of the alleged abuse occurred in the defendant's home; and (4) the charged and uncharged conduct was nearly identical. The state further argued that, considering these similarities, the twelve years between the charged and uncharged acts did not render the prior misconduct too remote in time.

On June 8, 2015, the defendant filed a motion in limine seeking to preclude the prior misconduct testimony of S. In support of his motion, the defendant argued that S and A were not similarly situated because the defendant was a minor himself when he allegedly abused S. The defendant further argued that the conduct complained of by S was too remote in time relative to the charged conduct because it occurred more than one decade beforehand. Finally, the defendant argued that the probative value of the evidence was minimal and outweighed by its prejudicial effect.

On June 16 and 24, 2015, the court heard oral argument on the defendant's motion in limine. The court subsequently denied the defendant's motion to preclude prior misconduct testimony offered by the state through S. The court concluded that S and A were sufficiently similar persons, noting that both victims were similar in age when the misconduct began and were cousins of the defendant. The court further concluded that the alleged conduct was sufficiently similar, and that the gap in time between S's allegations and A's allegations was not too remote in light of relevant case law discussing remoteness. Finally, the court determined that the probative value of the evidence outweighed its prejudicial effect. Accordingly, S was allowed to testify at trial about the defendant's prior misconduct.[8]

We begin our analysis of the defendant's claim by setting forth the applicable standard of review. "The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Heck*, 128 Conn. App. 633, 638, 18 A.3d 673, cert. denied, 301 Conn. 935, 23 A.3d 728 (2011).

As a general rule, prior misconduct evidence is inadmissible to prove the defendant's bad character or criminal tendencies. See Conn. Code Evid. § 4-5 (a) ("[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person except as provided in subsection [b]"). In *State* v. *DeJesus*, 288 Conn. 418,

470, 953 A.2d 45 (2008), however, our Supreme Court recognized "a *limited* exception to the prohibition on the admission of uncharged misconduct evidence in *sex crime* cases to prove that the defendant had a propensity to engage in aberrant and compulsive criminal sexual behavior." (Emphasis in original.) This exception to the admission of propensity evidence was subsequently codified in § 4-5 (b) of the Connecticut Code of Evidence.

Under § 4-5 (b) and *DeJesus*, evidence of uncharged sexual misconduct is admissible "if it is relevant to prove that the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged." Id., 473. "[E]vidence of uncharged misconduct is relevant to prove that the defendant had a propensity or a tendency to engage in the crime charged only if it is (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed upon persons similar to the [complaining] witness." (Internal quotation marks omitted.) Id. In addition, the court must also find that the probative value of the evidence "outweighs the prejudicial effect that invariably flows from its admission."[9] (Internal quotation marks omitted.) Id.

The defendant first argues that the prior misconduct, which occurred twelve years before the charged conduct, is too remote in time. In assessing remoteness, "we compare the time with reference to the period between the cessation of the prior misconduct and the beginning of the charged sexual abuse." (Internal quotation marks omitted.) *State* v. *Antonaras*, 137 Conn. App. 703, 716, 49 A.3d 783, cert. denied, 307 Conn. 936, 56 A.3d 716 (2012). Our Supreme Court has declined to "adopt a bright line rule for remoteness, or a rule that establishes a presumption that after ten years the uncharged conduct is too remote." *State* v. *Acosta*, 326 Conn. 405, 414, 164 A.3d 672 (2017). Thus, although "increased remoteness in time does reduce the probative value of prior misconduct evidence . . . it alone is not determinative." (Citations omitted; internal quotation marks omitted.) Id., 414–15. "[R]elatively remote uncharged sexual misconduct evidence" may be admissible "if the other relevant similarities [warrant] it." Id., 415.

Here, the twelve year gap between the uncharged and charged conduct does not render the prior misconduct evidence per se inadmissible. Our Supreme Court has concluded that prior misconduct evidence is admissible even if it occurred twelve years before the charged misconduct in light of the relative strength of the other two *DeJesus* prongs. See id. (holding that twelve year gap between uncharged and charged conduct not too remote); *State* v. *Jacobson*, 283 Conn. 618, 632–33, 930 A.2d 628 (2007) (ten year gap not too remote); *State* v. *Romero*, 269 Conn. 481, 498, 849 A.2d 760 (2004) (nine

year gap not too remote). Although our Supreme Court has acknowledged that "twelve years is not an insignificant period of time," it has maintained that courts should not consider individual prongs of the *DeJesus* test in isolation. (Internal quotation marks omitted.) *State* v. *Acosta*, supra, 326 Conn. 415.

It is therefore necessary to consider the remoteness of the uncharged misconduct together with the other two *DeJesus* prongs. Regarding the second prong of *DeJesus*, that is, the similarity of the uncharged and charged conduct, the defendant argues that the frequency and severity of the conduct alleged by S and A differed substantially. The defendant asserts that his alleged abuse of S progressed far more slowly than his alleged abuse of A because S alleged that it took two to three years for the abuse to progress to oral and anal intercourse. With A, however, the abuse seemingly occurred over just a period of months.[10] The defendant also argues that the severity of the charged and uncharged conduct is dissimilar because A reported that the defendant had penetrated her vagina with his penis, while S did not. Furthermore, the defendant argues that the charged and uncharged conduct is distinguishable because S alleged that the defendant's sister was often present in the same room when the abuse occurred, whereas A reported that she and the defendant were alone during these times.

Turning to the relevant law, "[i]t is well established that the victim and the conduct at issue need only be similar—not identical—to sustain the admission of uncharged misconduct evidence." (Internal quotation marks omitted.) Id., 416. Additionally, although not an exhaustive list, some factors our appellate courts have considered in evaluating similarity of the charged and uncharged conduct are the frequency and severity of the abuse, as well as the location where the abuse took place and whether it occurred in the vicinity of others. *State* v. *Antonaras*, supra, 137 Conn. App. 717–19.

Here, there was evidence before the court from which it reasonably could conclude that the charged and uncharged conduct was sufficiently similar. Many of the acts the defendant performed on S and A were identical. Specifically, both S and A alleged that the defendant had engaged in oral and anal intercourse, touched their chest and genitalia, and showed them pornographic films. Furthermore, although it is true that A also accused the defendant of engaging her in vaginal intercourse while S did not, S reported that the defendant told her that he wanted to "take [her] virginity" and "be the first one to put his penis in [her] vagina."

The defendant argues that the fact that his sister was often in the same room when the abuse occurred, while A and the defendant were alone during these times, distinguishes the charged and uncharged conduct. S

stated, however, that the defendant's sister was asleep or watching television and did not know what was transpiring—much like Ashley C. and the defendant's children being in the defendant's house but asleep or otherwise unaware of the abuse. Notably, in both instances the abuse occurred in the defendant's home and in the vicinity of other family members.

Finally, considering the many other similarities between the charged and uncharged conduct, the fact that the defendant abused S for a much longer period of time than he abused A does not significantly weigh against the admission of S's testimony. See *State* v. *James G.*, 268 Conn. 382, 394, 844 A.2d 810 (2004) (defendant's abuse of complaining witness lasted less than one year because her half-sister, whom defendant had been abusing for eight years, reported abuse; fact that complaining witness and half-sister "suffered sexual abuse for different lengths of time [did] not illustrate a behavioral difference of any significance").

The third and final prong of *DeJesus* assesses the similarity of the misconduct witness to the complaining witness. The defendant argues that S and A are not sufficiently similar because the nature of the defendant's relationship with S was different from the nature of his relationship with A. Specifically, the defendant was a minor himself throughout the years he allegedly abused S, and, arguably, S's peer. With respect to A, however, the defendant was an authority figure.

"As with conduct, the victim[s] . . . at issue need only be similar—not identical—to sustain the admission of uncharged misconduct evidence." (Internal quotation marks omitted.) *State* v. *Acosta*, supra, 326 Conn. 417. The age of each witness at the time of the abuse, as well as their familial relationship to the defendant, are both factors a court may properly consider. See id., 418. The nature of the defendant's relationship with each witness is also significant. *State* v. *Gupta*, 297 Conn. 211, 229–30, 998 A.2d 1085 (2010).

In support of his claim, the defendant cites *State* v. *Ellis*, 270 Conn. 337, 853 A.2d 676 (2004), and *State* v. *Gupta*, supra, 297 Conn. 211. In *Ellis*, the defendant, a softball coach, was charged in separate cases with having sexually assaulted three teenage girls: Sarah S., Julia S., and Kristin C. *State* v. *Ellis*, supra, 339–40. The three cases were consolidated and tried together. Id., 342. The defendant argued on appeal that the trial court had improperly admitted prior misconduct evidence regarding Julia S., Kristin C., and a fourth victim, Kaitlyn M., in Sarah S.'s case. Id., 352.

Our Supreme Court agreed with the defendant that the trial court had, in fact, improperly admitted the three instances of prior misconduct in Sarah S.'s case. Id., 358. In so holding, our Supreme Court found that the defendant's abuse of Sarah S. was much more fre-

quent and severe than his abuse of the other victims. Id., 359–60. The defendant had subjected Sarah S. to a "wide range of misconduct," including masturbating and ejaculating in her presence, digital penetration, attempting to climb on top of her while she was in bed, and attempting to force her to perform oral sex, among other things. Id., 359. The defendant's abuse of the three prior misconduct witnesses—including fondling their breasts in public, touching one of the victims' legs, and attempting to force his tongue into her mouth—was far less egregious in comparison. Id., 359–60.

Furthermore, in *Ellis*, the defendant's relationship with Sarah S. "differed in several key respects from his relationships with the other girls." Id., 360. Specifically, the prior misconduct witnesses were all players on various softball teams coached by the defendant, had developed close personal relationships with the defendant over a period of several years, and regarded him as a confidant. Id., 361. Sarah S., however, had not been coached by the defendant and had not developed a close relationship with him. Id. Thus, our Supreme Court concluded that "[Sarah S.] did not feel compelled, as did the other girls, to cultivate or continue a relationship with the defendant following the abuse because of his ability to assist her in obtaining a college softball scholarship. Therefore, it cannot be inferred logically that, if the defendant was guilty of the charged and uncharged offenses involving Julia S., Kristin C. and Kaitlyn M., he also must have been guilty of the charged offenses involving Sarah S." Id.

The defendant also cites to *State* v. *Gupta*, supra, 297 Conn. 211. In *Gupta*, three women alleged that the defendant, a physician, sexually assaulted them during various examinations. Id., 215–19. The three cases were consolidated for trial. Id., 214. Our Supreme Court held that the trial court had improperly admitted prior misconduct evidence from one victim, M, in the cases of the other two victims. Id., 233. Specifically, as in *Ellis*, the defendant's abuse of M was far more egregious than his abuse of the other two victims. Id., 226–28. M alleged that the defendant had grabbed her breasts, pinched her nipples, exposed her vagina, tapped her pelvic bone, and exclaimed that she was "so hot." (Internal quotation marks omitted.) Id., 226–27. The other two victims, however, alleged only that the defendant had exposed and fondled their breasts. Id., 216–18. Additionally, the fact that M was employed with the defendant's medical group and had a continuing relationship with him further distinguished her from the other two victims. Id., 230.

The present case is distinguishable from *Ellis* and *Gupta* because in both those cases there were material differences regarding the severity of misconduct *in addition to* differences between the misconduct and the complaining witnesses. Here, however, the severity

of the charged and uncharged conduct was sufficiently similar—both S and A complained that the defendant had performed oral sex on them, as well as penetrated them anally with his penis. Furthermore, we conclude that the trial court reasonably could have found that S was sufficiently similar to A to admit the prior misconduct testimony. Both S and A are cousins of the defendant. Additionally, S and A were nearly identical in age when the defendant began abusing them. Although S and the defendant are much closer in age, S was only four or five when the abuse began. The defendant, being eleven or twelve, still would have been able to exert considerable influence over S, much like he was able to exert influence over A as her older cousin and baby-sitter. Thus, although the court reasonably could have weighed the differences between S and A more heavily, it did not abuse its discretion in concluding that S and A were sufficiently similar.

Having considered and weighed the similarity of the charged and uncharged conduct, as well as the similarity of S and A, we return to the remoteness prong of *DeJesus*. In light of the relative strength of the other two *DeJesus* prongs, we conclude that the court did not abuse its discretion in determining that the twelve year gap in time between the uncharged conduct and the charged conduct was not too remote. *See State* v. *Acosta*, supra, 326 Conn. 417–19 (trial court did not abuse discretion in admitting uncharged sexual misconduct evidence that occurred twelve years prior to charged conduct because both victims were prepubescent when misconduct occurred and nieces of defendant, and initial stages of charged and uncharged misconduct were sufficiently similar).

Finally, the defendant argues that the probative value of S's prior misconduct evidence does not outweigh its prejudicial effect. The defendant does not explain how, exactly, the prior misconduct evidence is *unduly* prejudicial. Rather, he concludes that the probative value of the evidence is quite minimal because of the disparity in age difference between the defendant and S (approximately seven years) and the defendant and A (approximately twenty-two years). Furthermore, the defendant argues that he exhibited a "lack of compulsivity" because he had access to other young girls who did not report abuse.

"In balancing the probative value of such evidence against its prejudicial effect . . . trial courts must be mindful of the purpose for which the evidence is to be admitted, namely, to permit the jury to consider a defendant's prior bad acts in the area of sexual abuse or child molestation for the purpose of showing propensity." (Internal quotation marks omitted.) *State* v. *DeJesus*, supra, 288 Conn. 473–74. "Although evidence of child sex abuse is undoubtedly harmful to the defendant, that is not the test of whether evidence is unduly

prejudicial. Rather, evidence is excluded as unduly prejudicial when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Antonaras*, supra, 137 Conn. App. 722–23. "The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Morales*, 164 Conn. App. 143, 179, 136 A.3d 278, cert. denied, 321 Conn. 916, 136 A.3d 1275 (2016).

Turning to the present case, the record indicates that the court carefully considered the admissibility of the prior misconduct evidence offered by S and ultimately found that it was highly probative, considering the similarities between the alleged conduct, as well as between S and A Furthermore, in assessing the prejudicial effect of S's testimony, we conclude that S's allegations of misconduct were no more severe or egregious than the conduct for which the defendant was charged. In fact, unlike S, A alleged that the defendant had subjected her to vaginal intercourse, in addition to oral sex and anal intercourse. Therefore, S's testimony was no more likely than A's testimony to arouse the emotions of the jury. In sum, we conclude that the trial court did not abuse its discretion in admitting the prior misconduct evidence offered by S.

II

The defendant next claims on appeal that the trial court improperly admitted into evidence statements that A made to J, Dr. Py, Dr. Walsh, and Vidro under the medical diagnosis and treatment exception to the hearsay rule. The defendant argues that the court abused its discretion in admitting A's statements because the purpose of A's interactions with J, Dr. Py, Dr. Walsh, and Vidro was investigatory. The defendant further argues that A's out-of-court statements were not reasonably pertinent to medical diagnosis or treatment.[11] The defendant cannot prevail on his claim.

The following facts are relevant to the defendant's claim. On or about June 30, 2015, the state filed a motion in which it argued that statements made by A to J, Dr. Py, Dr. Walsh, and Vidro, among others,[12] were admissible under § 8-3 (5) of the Connecticut Code of Evidence as statements made for the purpose of obtaining medical diagnosis or treatment.

On July 13, 2015, the court held a hearing on the state's motion and, outside the presence of the jury, asked the state to make a proffer as to each witness. With respect to J, the state proffered that she did not feel comfortable with Officer McMahon questioning A at the defendant's residence. Rather, J wanted to transport A to a hospital so she could be seen by a medical

doctor or psychiatrist. J then drove to the hospital with A.

On the way to the hospital, J told A that she was taking her to see a doctor and needed to know the truth about what happened. A responded that the defendant had licked her private parts. J did not question A further. The state argued that A's statement was admissible under the medical treatment hearsay exception because J's motivation in gathering that information from A was to seek further medical assistance for her child.

With respect to Dr. Py, the state proffered that, when A was initially examined at Waterbury Hospital, she told Dr. Py that the defendant had sexually abused her earlier that day. A also told Dr. Py that the defendant sometimes took A's pants off when she was alone watching television and licked her privates.

With respect to Dr. Walsh, the state proffered that A was examined by her upon referral by Dr. Py to the emergency department at Yale-New Haven Hospital for treatment. During Dr. Walsh's physical examination of A, A told Dr. Walsh that the defendant had touched her privates with his hands, licked her privates, and penetrated her vagina with his penis. A also told Dr. Walsh that her privates hurt and that the defendant sometimes said mean things to her. Dr. Walsh observed that A's labia minora were red and tender, and that A had an abrasion on her clitoral hood.

With respect to Vidro, the state proffered that Dr. Walsh had referred A to the Yale Child Sexual Abuse Clinic for a follow-up examination by Dr. Pavlovic to determine whether A's injuries had healed. Dr. Pavlovic asked Vidro to conduct an interview of A so that Dr. Pavlovic could fully understand the nature of the complaint before her examination. Detective Dougherty and a representative from the Department of Children and Families also observed the interview. During the interview, A told Vidro that the defendant had licked her private parts, humped her, penetrated her with his penis vaginally and anally, and masturbated to the point of ejaculation.

At the hearing, the defendant objected to the proffered testimony from J, Dr. Py, and Vidro. With respect to J, the defendant argued that her credibility was limited because she was A's mother, and not a medical professional. The defendant further argued that J's purpose in asking A what had happened was investigatory in nature. With respect to Dr. Py, the defendant argued that A's statements were not pertinent to treatment. With respect to Vidro, the defendant argued that the forensic interview served an investigatory as well as medical purpose, and was therefore improperly admitted.

Subsequently, the court issued an oral ruling permitting each of the witnesses to testify regarding the state-

ments A made to them under the hearsay exception for medical diagnosis and treatment. The court found that, with respect to Dr. Py and Dr. Walsh, A's statements were made "in connection with determining what had happened and what [Dr. Py and Dr. Walsh] needed to do in terms of diagnosis and treatment."

With respect to Vidro, the court found that the fact that at least one purpose of the interview was to aid Dr. Pavlovic in her follow-up examination of A was sufficient to qualify A's statements under the medical diagnosis and treatment exception. The court further found that Vidro had the expertise and training necessary to conduct the interview. Finally, the court ruled that J could testify to the statement A made to her in the car, "given that [J] was taking the child to the hospital, given the reason she responded to the house, why she was taking the child to the hospital, and what [J] expressed in terms of the evaluation and the assessment . . . ."

Turning now to the relevant standard of review, "[t]o the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In other words, only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought." (Citations omitted; internal quotation marks omitted.) *State* v. *Miguel C.*, 305 Conn. 562, 571–72, 46 A.3d 126 (2012).

Regarding the relevant law, "[i]t is well settled that . . . [a]n out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies." (Internal quotation marks omitted.) *State* v. *Carrion*, 313 Conn. 823, 837, 100 A.3d 361 (2014); Conn. Code Evid. § 8-2. An exception exists, however, for statements made for the purpose of obtaining medical diagnosis or treatment. Conn. Code Evid. § 8-3 (5). A hearsay statement is admissible under the medical diagnosis or treatment exception when it is "made for purposes of obtaining a medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical diagnosis or treatment." Conn. Code Evid. § 8-3 (5).

"The rationale underlying the medical treatment exception to the hearsay rule is that the patient's desire to recover his health . . . will restrain him from giving

inaccurate statements to a physician employed to advise or treat him." (Internal quotation marks omitted.) *State* v. *Cruz*, 260 Conn. 1, 7, 792 A.2d 823 (2002). "Although [t]he medical treatment exception to the hearsay rule requires that the statements be both pertinent to treatment and motivated by a desire for treatment . . . in cases involving juveniles, our cases have permitted this requirement to be satisfied inferentially." (Citation omitted; internal quotation marks omitted.) *State* v. *Telford*, 108 Conn. App. 435, 441–42, 948 A.2d 350, cert. denied, 289 Conn. 905, 957 A.2d 875 (2008). Furthermore, "[i]n sexual abuse cases, statements made by the complainant about the identity of the person causing the injury may be found relevant to proper diagnosis and treatment." Id., 440.

Moreover, the statement sought to be admitted need not be made to a physician. *State* v. *Cruz*, supra, 260 Conn. 10. "The rationale for excluding from the hearsay rule statements that a patient makes to a physician in furtherance of obtaining medical treatment applies with equal force to such statements made to other individuals *within the chain of medical care*." (Emphasis added.) Id. For example, our Supreme Court held in *Cruz* that "statements made by a sexual assault victim to a *social worker* who is acting within the chain of medical care may be admissible under the medical treatment exception to the hearsay rule." (Emphasis added.) Id.; see also *State* v. *Maldonado*, 13 Conn. App. 368, 372, 536 A.2d 600 (holding that hospital security guard who assisted treating physician in interpreting medical history of three and one-half year old abuse victim could testify at trial that victim had identified her father as abuser), cert. denied, 207 Conn. 808, 541 A.2d 1239 (1988). Furthermore, "statements may be reasonably pertinent . . . to obtaining medical diagnosis or treatment even when that was not the *primary purpose* of the inquiry that prompted them, or the principal motivation behind their expression." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Griswold*, 160 Conn. App. 528, 552–53, 127 A.3d 189, cert. denied, 320 Conn. 907, 128 A.3d 952 (2015).[13]

Turning to the facts of the present case, the record amply supports the trial court's determination that A's statements to Dr. Py were made for the purpose of, and were reasonably pertinent to, obtaining medical diagnosis and treatment. In order to treat A, it was necessary for Dr. Py to ask A about the duration, frequency, method, and extent of the abuse. This information was also necessary to determine whether to transfer A to a hospital that specializes in treating child victims of sexual abuse. Additionally, this court has held that statements relating to the identity of the victim's abuser are relevant to diagnosis and treatment. *State* v. *Telford*, supra, 108 Conn. App. 440.

Similarly, the statements A made to Dr. Walsh were

properly admitted. A was transferred to Dr. Walsh at Yale-New Haven Hospital because Dr. Py had determined that Waterbury Hospital did not have the resources necessary to treat A's injuries. A's statements relaying the acts committed by the defendant and her pain level, as well as Dr. Walsh's observations regarding the injuries to A's genitalia, were necessary to determine the extent of the physical and psychological abuse as well as the appropriate scope of treatment.

The defendant's argument that the statements made by A to Vidro during the forensic interview were improperly admitted because the purpose of the interview was investigatory is without merit. This court held in *Griswold* that statements may be admissible even if the primary purpose of the inquiry is not medical so long as there is sufficient evidence that the statements were reasonably pertinent to obtaining medical diagnosis and treatment. See *State* v. *Griswold*, supra, 160 Conn. App. 552–53, 557. In the present case, the state argued that the purpose of Vidro's interview was to help Dr. Pavlovic better understand the nature of A's complaint so that Dr. Pavlovic could conduct a thorough medical examination of A. The court therefore did not abuse its discretion in admitting A's statements to Vidro under the medical diagnosis and treatment exception to the hearsay rule after finding that at least one purpose of the interview was to assist Dr. Pavlovic's medical examination of A.

Finally, the defendant argues that A's statement to J that the defendant had licked A's privates was improperly admitted because J took A to the hospital "for the purpose of further investigation, not treatment." Even if we assume, without deciding, that the court improperly admitted A's statement to J, we conclude that any error was harmless.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 311 Conn. 80, 89, 83 A.3d 595 (2014). "[A] nonconstitutional error is harmless when an appellant court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) Id. Whether the defendant was harmed by the trial court's evidentiary ruling is guided by a number of factors, such as the importance of the testimony to the state's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination permitted, the impact of the evidence on the trier of fact and the result of the trial, and the overall strength of the state's case. Id.

The defendant does not directly argue why the statement A made to J in the car was harmful. Regardless, it is clear that if any such error was made, it was harmless.

First, A's statement to J that the defendant had licked her privates was cumulative of similar statements she made to others. A repeated that same allegation—specifically, that the defendant had performed oral sex on her—to Dr. Py and Vidro, both of whom we have already determined properly testified to A's respective statements at trial.

Second, the overall strength of the state's case was quite high. A alleged that the defendant had sexually assaulted her on April 9, 2014. That afternoon, A reported the abuse. Just hours later, A underwent a physical examination. The findings of that physical examination—that A was tearful to the touch, had redness and discharge on her labia, and an abrasion on the lips of her vagina—corroborated A's allegations that she had been sexually assaulted earlier that day. Moreover, A's allegations were further bolstered by S's testimony that the defendant had abused her in the same way when she was A's age.

On the basis of the foregoing evidence, we conclude that the trial court did not abuse its discretion by admitting the victim's statements to Dr. Py, Dr. Walsh, and Vidro because the statements were reasonably pertinent to obtaining medical diagnosis or treatment. We further conclude that any error the court may have made in admitting A's statement to J was harmless.

### III

Finally, the defendant claims that the trial court committed plain error by admitting evidence (1) of the opinions of A's medical providers that A had been sexually assaulted, and (2) that improperly vouched for A's credibility. We disagree.

The following facts are relevant to the defendant's claim. At trial, Dr. Py testified generally about the protocol Waterbury Hospital follows when a patient comes in complaining of sexual abuse. Specifically, Dr. Py testified that she would obtain the history of the patient, perform a general physical examination, and, if necessary, transfer the patient to "an appropriate level of care" because "certain sexual assault cases require specialists that Waterbury Hospital does not have." Dr. Py also testified that on April 9, 2014, A came in complaining of sexual abuse and, after taking A's history and performing a general physical examination, Dr. Py recommended that A be transferred to a hospital with a team of physicians that specialized in treating sexual abuse. Furthermore, the state offered into evidence A's medical record from Waterbury Hospital, which contained Dr. Py's differential diagnosis of "sexual assault." The state did not question Dr. Py regarding the contents of the record.

On cross-examination, defense counsel questioned Dr. Py about the differential diagnosis. When defense counsel asked what a differential diagnosis consisted

of, Dr. Py responded, "it's just basically something that we put based on the chief complaint, what it could be, why she's here." Dr. Py further clarified that the differential diagnosis was not conclusive and reflected only A's verbal allegation that she had been sexually assaulted.

Thereafter, the state offered the testimony of Dr. Walsh. Dr. Walsh testified that Waterbury Hospital had referred A to Yale-New Haven Hospital "for evaluation of a sexual assault." The state asked Dr. Walsh whether she was able to diagnose A, to which Dr. Walsh responded that "based on her history and what she . . . and her mother told us, and based on her physical exam findings, it was consistent with sexual assault, so we gave her the diagnosis of sexual assault with a small abrasion, a small scrape on her genital area." Dr. Walsh further testified that she referred A to the Yale Child Sexual Abuse Clinic for a follow-up because "[t]hey're experts in detecting and treating child abuse," and "have social workers and staff that are skilled in treating kids that have been sexually assaulted." The state offered into evidence the medical report generated by Dr. Walsh.

The state also offered the testimony of Dr. Pavlovic, who testified that she is board certified in child abuse pediatrics, which is a "specialty involving evaluation of children who are suspected to be abused, either physically or sexually." When the state asked Dr. Pavlovic what she did at the Yale Child Sexual Abuse Clinic, she responded that "[m]ost patients seen at the clinic are victims of sexual abuse—occasionally we will see children who are victims of physical abuse . . . ." Dr. Pavlovic explained that children complaining of sexual abuse undergo a physical examination of their genitalia and anus, including an examination of the hymen if the child is female. Dr. Pavlovic further testified that A had a "normal exam," which was not unusual for a child that complained of sexual abuse, and that "ninety-five percent of the time . . . the exam is normal . . . ."

The defendant did not object to the admission of any of this evidence at trial. Nevertheless, the defendant seeks to prevail on this claim under the plain error doctrine. "[T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion

. . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citations omitted; internal quotation marks omitted.) *State* v. *Myers*, 290 Conn. 278, 289, 963 A.2d 11 (2009).

Even if we were to conclude that this evidence, upon proper and timely objection, should not have been admitted because it either (1) constituted improper opinion testimony on the ultimate issue in the case; see *State* v. *Favoccia*, 306 Conn. 770, 786–87, 51 A.3d 1002 (2012) (expert witnesses ordinarily may not express opinion on ultimate issue of whether complainant has been sexually abused); or (2) improperly vouched for the credibility of the complaining witness; see id., 786; we conclude that any evidentiary impropriety under the circumstances of this case was not so harmful that a failure to reverse the judgment would result in manifest injustice.

To begin, the state did not question Dr. Py on direct examination about the diagnosis of sexual assault contained in her medical record. Rather, it was defense counsel, on cross-examination, who brought the jury's attention to the diagnosis. In doing so, defense counsel was successfully able to elicit from Dr. Py that the diagnosis was differential in nature, meaning that it reflected nothing more than A's allegation that the defendant had assaulted her, and that Dr. Py's examination of A had not necessarily confirmed that allegation. Ultimately, the defendant was able to ameliorate significantly any harmful effect of the admission of the medical record, at least to such extent that a manifest injustice did not occur.

As with Dr. Py, defense counsel's cross-examination of Dr. Walsh similarly ameliorated the harmful effect of her testimony on direct examination that she "gave [A] the diagnosis of sexual assault with a small abrasion . . . ." Specifically, defense counsel questioned Dr. Walsh about the results of A's physical examination and was able to elicit from Dr. Walsh that there were potentially many alternative causes of A's injuries, such as wearing tight clothing or self-injury. Defense counsel also elicited from Dr. Walsh that, although A had exhibited some injuries, she had not suffered more significant trauma such as bleeding, bruising, or damage to her hymen.

Moreover, during closing argument, the state did not rely on the expert opinion of Dr. Py or Dr. Walsh regarding whether A had been sexually assaulted. Rather, to the extent that the state referred to these witnesses, it was to emphasize the medical findings of physical injury to A and that those findings were consistent with her

allegations of sexual assault. Furthermore, during the defendant's closing argument, counsel for the defense made clear to the jury that it was not bound by any of the physicians' diagnoses of sexual assault.

Finally, with respect to Dr. Pavlovic, even if we assume, without deciding, that her testimony improperly vouched for A's credibility, any error was not so harmful as to rise to the level of manifest injustice. This case was not one wherein "the defendant was convicted largely on the strength of the complainant's testimony standing by itself—a situation that elevates the risk that inadmissible expert opinion testimony might have the effect of improperly bolstering the complainant's credibility." See *State* v. *George A.*, 308 Conn. 274, 292, 63 A.3d 918 (2013); id., 292–93 (expert witness' improper vouching for complainant's credibility was not so harmful as to require reversal because complainant's testimony was corroborated by prior misconduct evidence as well as physical evidence). Rather, the state's case against the defendant was quite strong, as discussed in part II of this opinion. A's allegations were corroborated by S's testimony describing prior similar misconduct of the defendant, as well as Dr. Walsh's findings that A had sustained physical injuries to her genitals after A alleged that the defendant had sexually assaulted her earlier that day. For these reasons, we conclude that any evidentiary impropriety did not result in manifest injustice requiring reversal of the judgment.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] The defendant later entered into evidence a stipulation concerning the DNA testing results of the biological sample taken from A shortly after A reported the abuse. The stipulation provided that the defendant was not the source of any DNA found in the sample. There was no evidence presented at trial that any other person was a contributor to the DNA profile obtained from the testing.

[2] No pornography was found on the defendant's phone.

[3] Feola testified that she never had any academic concerns about A prior to the April 9, 2014 incident. After Feola became aware of A's complaint, however, she began noticing behavioral changes in A. Specifically, A had trouble completing a phonetics lesson one morning. The phonetics lesson was meant to help the students pronounce the letter "e," and featured the name "Eddie." During the lesson, A began rocking back and forth and crying. When Feola asked A what was wrong, she responded that "Eddie was the name of the bad guy . . . ." Feola then switched the name "Eddie" with the word "elephant," and A no longer had trouble completing the lesson.

[4] The defendant testified that he had not sexually assaulted A or shown her pornography.

[5] Ashley C., as well as the defendant's neighbor, Fransauch Marleen Castillo, testified that A had not accused the defendant of sexual misconduct on April 9, 2014. Rather, Ashley C. and Castillo testified that A only said that the defendant had done "nasty stuff" to her. Ashley C. further testified that when she asked A what kind of "nasty stuff" the defendant did, A lifted up her leg, farted, and said, "that." Ashley C. also testified that, around the time the incident occurred, A had been misbehaving, and that she called J on April 9, 2014, because she had "had enough of [A's] behaviors"—not because she was concerned that A had been sexually assaulted.

[6] Christy C. is not related to the defendant or to Ashley C.

[7] The state's proffer was based on a written statement S made to the police.

[8] S testified consistently with the state's proffer. Specifically, S testified that: (1) she was the first cousin of the defendant, and J's sister; (2) she would often stay overnight at the defendant's house as a child; (3) the defendant began abusing her when she was four or five years old by touching and rubbing her chest and vagina over her clothes; (4) when she was seven, the defendant began performing oral sex on her, as well as penetrating her anus with his penis; (5) the defendant showed her pornographic movies; and (6) the abuse stopped when she was ten years old.

[9] The defendant asserts on appeal that, in order to be admissible, evidence of the defendant's prior sexual misconduct must also tend to demonstrate a "common plan or scheme." See Conn. Code Evid. § 4-5 (c) ("[e]vidence of other crimes, wrongs or acts of a person is admissible for purposes . . . such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony"). The defendant is mistaken. Subsection (b) of § 4-5 establishes a limited exception to the rule prohibiting the admission of propensity evidence, and specifically permits the trier of fact to consider prior misconduct evidence to establish that the defendant has a propensity to engage in aberrant and compulsive sexual behavior. The admissibility of evidence under this exception is not, by its terms, dependent upon the evidence meeting any other exception contained in other provisions of the code.

Subsection (c) of § 4-5, on the other hand, permits uncharged misconduct to be admitted, not as evidence of the defendant's propensity to engage in criminal behavior, but as evidence to prove other issues in the case such as intent, identity, a common plan or scheme, or an element of the crime. Accordingly, subsections (b) and (c) have fundamentally different purposes, and evidence sought to be admitted under subsection (b) is admissible even if it does not meet one of the recognized exceptions in subsection (c).

[10] The defendant and Ashley C. did not continuously babysit A from the fall of 2013 until A reported the abuse on April 9, 2014. From November, 2013 to sometime in February, 2014, J could not afford to pay the defendant and had another family member babysit A. It is therefore unclear whether the defendant began abusing A in the fall of 2013 or after she returned to the defendant's home in February, 2014.

[11] The defendant also contends that the admission of A's statements violates the sixth amendment's confrontation clause. Again, he is mistaken. A testified and was cross-examined by the defendant. See *Crawford* v. *Washington*, 541 U.S. 36, 51–53, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (confrontation clause not violated when declarant testifies and is subject to cross-examination regarding out-of-court statements).

[12] The state also sought to admit A's statements through a number of nurses and other medical personnel present during A's various examinations. The court ruled that these individuals would not be permitted to testify under the medical diagnosis and treatment exception because their testimony would be cumulative, and because A did not make the statements to those persons directly.

[13] After our Supreme Court decided *State* v. *Arroyo*, 284 Conn. 597, 625–35, 935 A.2d 975 (2007), and *State* v. *Maguire*, 310 Conn. 535, 563–71, 78 A.3d 828 (2013), it was unclear whether statements made during a forensic interview were inadmissible unless the *primary* purpose of the interview was for medical diagnosis or treatment. Subsequent to those cases, this court decided in *Griswold* that, if statements made during a forensic interview of the child are offered solely under the medical diagnosis and treatment exception, and the child is subject to cross-examination at trial, then such statements need only be reasonable pertinent to medical diagnosis and treatment to be admissible. *State* v. *Griswold*, supra, 160 Conn. App. 552–53. Accordingly, pursuant to *Griswold*, such statements are admissible even if the primary purpose of the declarant's statements was not to obtain medical diagnosis and treatment. Id.